# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

GENERAL CONFERENCE OF SEVENTH-DAY
ADVENTISTS, *an unincorporated
association, et al.*,

        *Plaintiffs,*

   v.

CLEVELAND L. HORTON, II, *in his official
capacity as Acting Executive Director of
the Maryland Commission on Civil
Rights, et al.*,

        *Defendants.*

Case No. 8:24-cv-02866

**MEMORANDUM IN SUPPORT
OF MOTION FOR
PRELIMINARY INJUNCTION**

**Hearing Requested**

Eric S. Baxter
D. Md. Bar No. 15640
Nicholas R. Reaves
D. Md. Bar No. 31293
Andrea R. Butler (pro hac vice pending)
THE BECKET FUND FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave, N.W.
  Suite 400
Washington, DC 20006
Tel.: (202) 955-0095
*ebaxter@becketlaw.org*

Todd R. McFarland
D. Md. Bar No. 28777
GENERAL CONFERENCE OF
SEVENTH-DAY ADVENTISTS
12501 Old Columbia Pike
Silver Spring, MD 20904
Tel.: (301) 680-6000
*mcfarlandt@gc.adventist.org*

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... ii

INTRODUCTION .............................................................................................. 1

BACKGROUND ................................................................................................. 2

    A.  The Seventh-day Adventist Church and its religious beliefs ......................... 2

    B.  Plaintiffs' religiously mandated employment practices ............................... 4

    C.  The Maryland Fair Employment Practices Act (MFEPA) ............................. 6

    D.  MFEPA's religious exemption ....................................................................... 7

    E.  The Maryland Supreme Court's restrictive reading ...................................... 8

    F.  Plaintiffs' religious exercise conflicts with MFEPA ..................................... 9

LEGAL STANDARD .......................................................................................... 9

ARGUMENT ..................................................................................................... 10

I.  Plaintiffs are likely to succeed on the merits of their claims. .......................... 10

    A.  MFEPA violates Plaintiffs' church autonomy rights (Count I). ...................... 10

    B.  MFEPA excessively entangles the State in Plaintiffs' religious
        decision-making in violation of the Religious Clauses (Count II). ................. 15

    C.  MFEPA violates Plaintiffs' Free Exercise rights (Count III). ......................... 21

        1.  Preventing Plaintiffs from hiring employees who share
            their faith burdens Plaintiffs' religious exercise. ..................................... 21

        2.  MFEPA's nondiscrimination requirements are not
            generally applicable. ................................................................................ 21

        3.  MFEPA's prohibition on mission-aligned hiring cannot
            satisfy strict scrutiny. ............................................................................. 23

II.  The other preliminary injunction factors are met. .......................................... 26

III. Plaintiffs have standing to challenge MFEPA. ............................................... 28

CONCLUSION .................................................................................................. 30

CERTIFICATE OF SERVICE ............................................................................ 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aparicio v. Christian Union, Inc.*,
  No. 18-cv-592, 2019 WL 1437618 (S.D.N.Y. Mar. 29, 2019) .................................. 13

*Askew v. Trs. of Gen. Assembly of Church of Lord Jesus Christ of the
  Apostolic Faith Inc.*,
  684 F.3d 413 (3d Cir. 2012) .................................................... 15

*Ass'n of Cmty. Cancer Ctrs. v. Azar*,
  509 F. Supp. 3d 482 (D. Md. 2020) ................................................. 27-28

*Behrend v. S.F. Zen Ctr., Inc.*,
  108 F.4th 765 (9th Cir. 2024) ..................................................... 14

*Bell v. Presbyterian Church (U.S.A.)*,
  126 F.3d 328 (4th Cir. 1997) ................................................ 11, 12, 13

*Billard v. Charlotte Catholic High Sch.*,
  101 F.4th 316 (4th Cir. 2024) ..................................................... 11

*Bouldin v. Alexander*,
  82 U.S. (15 Wall.) 131 (1872) .................................................... 15

*Brown v. Ent. Merchs. Ass'n*,
  564 U.S. 786 (2011) ............................................................. 26

*Bryce v. Episcopal Church in the Diocese of Colo.*,
  289 F.3d 648 (10th Cir. 2002) .................................................... 12

*Butler v. St. Stanislaus Kostka Catholic Acad.*,
  609 F. Supp. 3d 184 (E.D.N.Y. 2022) ............................................. 13

*Carson v. Makin*,
  596 U.S. 767 (2022) ............................................................. 16

*Centro Tepeyac v. Montgomery County*,
  722 F.3d 184 (4th Cir. 2013) ..................................................... 27

*Christian Legal Soc'y v. Walker*,
  453 F.3d 853 (7th Cir. 2006) ..................................................... 13

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ........................................................................ 24-25

*Cooksey v. Futrell,*
    721 F.3d 226 (4th Cir. 2013) ........................................................ 29-30

*Corp. of Presiding Bishop v. Amos,*
    483 U.S. 327 (1987) ........................................................... 14, 19-20

*Curay-Cramer v. Ursuline Acad. of Wilmington,*
    450 F.3d 130 (3d Cir. 2006) ............................................................ 12, 13

*Darren Patterson Christian Acad. v. Roy,*
    699 F. Supp. 3d 1163 (D. Colo. 2023) ................................................ 12

*Dmarcian, Inc. v. Dmarcian Eur. BV,*
    60 F.4th 119 (4th Cir. 2023) ........................................................... 9, 27

*Doe v. Catholic Relief Servs.,*
    300 A.3d 116 (Md. 2023) ...........................................................*passim*

*Does 1-11 v. Bd. of Regents of Univ. of Colo.,*
    100 F.4th 1251 (10th Cir. 2024) ..................................................... 15-16

*Duquesne Univ. of the Holy Spirit v. NLRB,*
    947 F.3d 824 (D.C. Cir. 2020) ........................................................... 19

*EEOC v. Catholic Univ. of Am.,*
    83 F.3d 455 (D.C. Cir. 1996) ........................................................... 17-18

*EEOC v. Roman Catholic Diocese of Raleigh,*
    213 F.3d 795 (4th Cir. 2000) ........................................................... 11, 12

*Espinoza v. Mont. Dep't of Rev.,*
    591 U.S. 464 (2020) ........................................................................ 24

*Everson v. Mich. Dep't of Corr.,*
    391 F.3d 737 (6th Cir. 2004) ........................................................... 23

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.,*
    82 F. 4th 664 (9th Cir. 2023) ........................................................... 23

*Fulton v. City of Philadelphia,*
    593 U.S. 522 (2021) ................................................................ 21-22, 24

iii

*Garrick v. Moody Bible Inst.*,
   412 F. Supp. 3d 859 (N.D. Ill. 2019) ...................................................... 13

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor*
   *& City Council*,
   683 F.3d 539 (4th Cir. 2012) .................................................................. 26

*Holt v. Hobbs*,
   574 U.S. 352 (2015) ............................................................................... 25

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
   565 U.S. 171 (2012) ......................................................................... 11, 14

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*
   *in N. Am.*,
   344 U.S. 94 (1952) .......................................................................... 10, 11

*Kennedy v. Bremerton Sch. Dist.*,
   597 U.S. 507 (2022) ............................................................................... 21

*Kenny v. Wilson*,
   885 F.3d 280 (4th Cir. 2018) ................................................... 28, 29, 30

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
   2 F.4th 330 (4th Cir. 2021) .................................................................. 28

*Legend Night Club v. Miller*,
   637 F.3d 291 (4th Cir. 2011) ................................................................ 27

*Mahmoud v. McKnight*,
   102 F.4th 191 (4th Cir. 2024) .............................................................. 21

*Mast v. Fillmore County*,
   141 S. Ct. 2430 (2021) .......................................................................... 25

*Miranda v. Garland*,
   34 F.4th 338 (4th Cir. 2022) ................................................................ 27

*Montrose Christian Sch. Corp. v. Walsh*,
   770 A.2d 111 (Md. 2001) ................................................................ 7, 26

*NLRB v. Catholic Bishop of Chi.*,
   440 U.S. 490 (1979) ......................................................................... 16, 17

*Our Lady of Guadalupe Sch. v. Morrisey-Berru*,
   591 U.S. 732 (2020) ............................................................. 10-11, 12, 15

*Patterson v. Walgreen Co.,*
  727 F. App'x 581 (11th Cir. 2018) ........................................................ 5

*Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.,*
  819 F.2d 875 (9th Cir. 1987) .............................................................. 15

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l
  Presbyterian Church,*
  393 U.S. 440 (1969) ........................................................................ 16

*Rayburn v. Gen. Conf. of Seventh-day Adventists,*
  772 F.2d 1164 (4th Cir. 1985) ......................................................*passim*

*Religious Sisters of Mercy v. Becerra,*
  55 F.4th 583 (8th Cir. 2022) ............................................................ 29

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
  592 U.S. 14 (2020) ......................................................................... 27

*Serbian E. Orthodox Diocese v. Milivojevich,*
  426 U.S. 696 (1976) .................................................................... 12, 16

*Tandon v. Newsom,*
  593 U.S. 61 (2021) .................................................................. 21, 22-23

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.,*
  450 U.S. 707 (1981) ....................................................................... 21

*Universidad Central de Bayamon v. NLRB,*
  793 F.2d 383 (1st Cir. 1985) ............................................................ 20

*Walz v. Tax Comm'n of City of N.Y.,*
  397 U.S. 664 (1970) ....................................................................... 16

*WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave,*
  553 F.3d 292 (4th Cir. 2009) ............................................................ 27

**Statutes**

Ariz. Rev. Stat. § 41-1462 .................................................................. 26

Ark. Rev. Stat. § 16-123-103 .............................................................. 26

Cal. Gov't Code § 12940 ................................................................... 26

Colo. Rev. Stat. § 24-34-402 .............................................................. 26

D.C. Code § 2-1401.03 ................................................................................ 26

Fla. Stat. § 760.10 ...................................................................................... 26

Haw. Stat. § 378-3 ...................................................................................... 26

Ind. Code § 22-9-5-22 ................................................................................ 26

Iowa Code § 216.6 ...................................................................................... 26

Mass. Stat. 151B § 4 ................................................................................... 26

Md. Code, State Gov't § 20-202 .................................................................. 7

Md. Code, State Gov't § 20-206 .................................................................. 7

Md. Code, State Gov't § 20-601 ............................................................ 6, 22

Md. Code, State Gov't § 20-602 .................................................................. 6

Md. Code, State Gov't § 20-604 .................................................................. 7

Md. Code, State Gov't § 20-605 .................................................... 6-7, 22, 23

Md. Code, State Gov't § 20-606 .................................................................. 6

Md. Code, State Gov't § 20-1004 ................................................................ 7

Md. Code, State Gov't § 20-1005 ................................................................ 7

Md. Code, State Gov't § 20-1006 ................................................................ 7

Me. Stat. 5 § 4573-A ................................................................................... 26

Minn. Stat. § 363A.26 ................................................................................. 26

Mo. Stat. § 213.010 .................................................................................... 26

Mont. Stat. § 49-2-101 ................................................................................ 26

N.H. Rev. Stat. § 354-A:18 ......................................................................... 26

N.J. Stat. § 10:5-12 ..................................................................................... 26

N.M. Stat. § 28-1-9 ..................................................................................... 26

N.Y. Exec. Law § 296 ................................................................................. 26

Ohio Stat. § 4112.02 ............................................................................................ 26

43 Pa. Stat. § 955 ............................................................................................... 26

R.I. Stat. § 28-5-6 .............................................................................................. 26

S.C. Stat. § 1-13-80 ............................................................................................ 26

S.D. Stat. § 20-13-18 .......................................................................................... 26

Tex. Lab. Code § 21.109 ..................................................................................... 26

42 U.S.C. § 2000e-1 ............................................................................................ 26

Utah Stat. § 34A-5-102 ....................................................................................... 26

Va. Code § 2.2-3905 ............................................................................................ 26

Vt. Stat. tit. 21, § 495 .......................................................................................... 26

Wis. Stat. § 111.337 ............................................................................................ 26

Wyo. Stat. § 27-9-102 ......................................................................................... 26

**Other Authorities**

*2021 SUSB Annual Data Tables by Establishment Industry: U.S. and States, NAICS, detailed employment*, U.S. Census Bureau (Dec. 21 2023) .................................................................................................. 22

## INTRODUCTION

Maryland law has always protected religious organizations' right to make employment decisions based on religious belief and affiliation. This right is critically important to Plaintiffs—the General Conference of Seventh-day Adventists and Adventist Risk Management—because their faith teaches that all employees must be models of the faith for Church members and witnesses to the truths of the Church in both word and deed.

But last year, the Maryland Supreme Court rewrote the religious exemption in the Maryland Fair Employment Practices Act (MFEPA), which had previously protected mission-aligned hiring by religious organizations like Plaintiffs. This reinterpretation of Maryland law makes Plaintiffs' religiously mandated hiring practices unlawful. Under the Maryland Supreme Court's new standard, Plaintiffs risk legal liability unless they either hire employees *regardless of* the employee's religious beliefs or convince a court that the employee's role "directly" advances a "core mission" of their organization.

This new test upends Plaintiffs' religious hiring practices. First, some employees (like janitors and maintenance workers) are now, according to the Maryland Supreme Court, categorically excluded from MFEPA's religious exemption. Second, for the remainder of Plaintiffs' employees, Plaintiffs can't know ahead of time how a court (or jury) will define their organization's core mission or decide whether a particular employee "directly" furthers that mission. And rather than provide a clear rule, the Maryland Supreme Court created five extra-textual (and admittedly non-exhaustive) factors to consider. This reinterpretation of Maryland law is harming Plaintiffs now, as they face the risk of lawsuits (by the government or private parties) for exercising their religion and following their religiously mandated hiring practices.

Faced with these current and threatened future injuries, Plaintiffs seek a ruling from this Court confirming that the U.S. Constitution bars secular authorities from

interfering when religious organizations limit hiring to Church members who uphold their faith. Plaintiffs' religious exercise is protected by multiple overlapping constitutional doctrines. First, the church autonomy doctrine ensures that religious organizations remain free to make internal church management decisions—including hiring decisions rooted in sincere religious beliefs—without fear of legal liability. This constitutional protection covers *all* employees as long as the employment decision is rooted in a sincere religious belief. Second, the prohibition on excessive entanglement, rooted in both Religion Clauses, prohibits courts from getting involved in religious disputes or answering religious questions. Here, the very process by which secular courts would apply MFEPA's narrowed religious exemption—independently evaluating an employee's role and whether it directly furthers the religious organization's core mission—is deeply entangling. Third, applying MFEPA's religious nondiscrimination requirement to Plaintiffs' mission-aligned hiring violates the Free Exercise Clause because the law is not generally applicable. MFEPA includes numerous secular exceptions covering over 80% of Maryland employers. Granting secular exceptions but not religious exceptions triggers strict scrutiny—a standard the government cannot meet.

Plaintiffs therefore seek a preliminary injunction from this Court to maintain their ability to employ only individuals who are observant members of their faith. This has long been Plaintiffs' practice and, until very recently, has long been Maryland law. The Court should maintain this *status quo ante* while the lawsuit is pending.

## BACKGROUND

### A. The Seventh-day Adventist Church and its religious beliefs

Plaintiff the General Conference of Seventh-day Adventists ("General Conference") is a religious nonprofit that serves as the highest ecclesiastical and administrative body of the Seventh-day Adventist Church (the "Church"). It

organizes the General Conference Session, the forum where Church members elect church officers every five years and make changes to the Church's constitution. In between Sessions, the General Conference and its executive committee are delegated authority to manage important church business, like adopting or modifying Church policies, employing personnel to carry out the Church's work, and electing Church officers. The General Conference exists "to help people everywhere understand the Bible to find freedom, healing, and hope in Jesus Christ." Compl. (ECF No. 1) ¶ 11.

Plaintiff Adventist Risk Management ("ARM") is a religious non-profit that serves as the insurance and risk management arm of the Church throughout the world. ARM exclusively serves ministries and affiliates of the Church and provides its services to more than 97,000 churches, 9,800 schools, and 1,900 hospitals. Compl. ¶ 12. ARM has offered risk management and insurance services to Adventist ministries since 1935, and its mission "is to protect the ministries of the Seventh-day Adventist Church." *Id.*

The Church is one of the most racially and ethnically diverse Christian denominations in the country. It has over twenty-two million members worldwide, and its ministries include education and humanitarian relief, among others. Compl. ¶¶ 18-19. While the Church shares many common Protestant beliefs—like the divine inspiration of the Old and New Testaments, the Trinitarian nature of God, and the experience of salvation through the life, death, and resurrection of Jesus Christ— the Church also holds unique beliefs that distinguish its faith. Seventh-day Adventists consider the Sabbath to be "a symbol of our redemption in Christ, a sign of our sanctification, a token of our allegiance, and a foretaste of our eternal future in God's kingdom." Compl. ¶¶ 20-21. Unlike many Protestant denominations, the Church observes a Saturday Sabbath. Compl. ¶ 21. Seventh-day Adventists also believe that the body is the living temple of the Holy Spirit, and as such believe in adequate exercise and rest, as well as abstention from unclean foods identified in

Scripture, such as pork and shellfish. Compl. ¶ 22. The Church also promotes a whole-food, plant-based diet, and many Church members are vegetarians or vegans. *Id.* Tobacco and alcohol are forbidden, while coffee, tea, and caffeinated beverages are discouraged. *Id.*

Plaintiffs also believe that the Church "has a divinely appointed ministry" and that the goal of all Adventist institutions is "to make good on the Adventist promise to help everyone understand the Bible and find freedom, healing and hope in Jesus." Compl. ¶ 23. Plaintiffs also believe that those they employ are integral parts of the Church's divinely appointed ministry. Compl. ¶ 24.

Plaintiffs therefore believe that even employees whose roles may not necessarily involve direct religious instruction are instrumental in carrying out the Church's mission. *Id.* This includes facilities personnel and gardeners. Andy Beattie, for example, was a gardener at an Adventist Hospital in Australia. As a gardener, his job description did not suggest he would play an important role in the Church's religious instruction or leadership. Compl. ¶ 25. Nevertheless, he brought vegetables to the needy, shared his faith with patients, and encouraged those he met to give up unhealthy substances like tobacco. Andy so well embodied this "divinely appointed ministry" that the Adventist hospital where he worked honored his service by naming a building after him. *Id.*

### B. Plaintiffs' religiously mandated employment practices

Consistent with these teachings of the Church, Plaintiffs teach that "Seventh-day Adventist denominational employees are to be models in every facet of their lives," Compl. ¶ 26, and that "Church members must see in church workers a fidelity to basic principles which is unequivocal," Compl. ¶ 127. Plaintiffs therefore also require that all their employees "demonstrate an exemplary commitment to the Lord and the teaching of His Church" and be "baptized, tithe-paying member[s] in regular standing of the Seventh-day Adventist Church." Compl. ¶ 26. Indeed, Plaintiffs have

implemented a licensing and credentialing process for all full-time employees (which must be renewed regularly) to help ensure that all employees remain committed to the Church's teachings. Compl. ¶ 27.

Plaintiffs' employment policies are also motivated by the Church's belief in the critical importance of observing the Sabbath. Seventh-day Adventists often face religious hostility in the workplace for their strict observance of the Sabbath (starting at sundown on Friday through sundown on Saturday). *E.g.*, *Patterson v. Walgreen Co.*, 727 F. App'x 581, 584-85 (11th Cir. 2018) (Seventh-day Adventist employee terminated for observing the Sabbath). To support Church members in both living out their faith and expressing their unique talents in the workplace, Plaintiffs believe that all roles in their organizations should be filled by Church members who share their religious commitment to the Saturday Sabbath.

Plaintiffs also require employees to adhere to Church teachings regarding personal conduct—such as the use of harmful substances, marriage and sexual conduct, modest dress, and healthful living. Compl. ¶¶ 28, 36. These standards include eschewing "the use of alcoholic beverages, tobacco in any form; illegal possession/misuse of drugs, etc.; use of profanity; immoral conduct including but not limited to engaging in pornographic activities, child sexual abuse, incest, fornication, adultery and homosexual practices; remarriage without Biblical grounds, as defined in the Church Manual." Compl. ¶ 36.

Plaintiffs make these requirements known to all job applicants and include them in their Employee Handbooks. Compl. ¶¶ 36-37, 73. If Plaintiffs learn that a current employee is violating these requirements, they first examine whether a breach of Church teachings has occurred and then attempt to reconcile with the employee. Compl. ¶ 38. If the employee continues to violate the terms of employment, Plaintiffs will take disciplinary action—up to and including termination of employment. *Id.*

**C. The Maryland Fair Employment Practices Act (MFEPA)**

The Maryland Fair Employment Practices Act (MFEPA) is Maryland's Title VII analogue that governs state law employment discrimination claims. Md. Code, State Gov't § 20-602(1). It prohibits covered employers from discriminating against employees or job applicants based on protected characteristics, such as race, sex, or, as relevant here, religion. *Id.* § 20-606(a)(1), (2). Covered employers also may not "print or cause to be printed or published any notice or advertisement relating to employment by the employer … that indicates any preference, limitation, specification, or discrimination based on … religion[.]"). *Id.* § 20-606(e)(1).

This nondiscrimination requirement, however, has numerous exceptions:

- Employers with fewer than fifteen employees are exempt from MFEPA. *Id.* § 20-601(d)(1)(i)(2).

- Section 501(c) tax-exempt "bona fide private membership club[s]" are exempt from MFEPA. *Id.* § 20-601(d)(3).

- Covered employers can discriminate based on "sex, age, religion, national origin, disability, or military status" if they are doing so based on "bona fide occupational qualification[s] reasonably necessary to the normal operation of that business or enterprise." *Id.* § 20-605(a)(1).

- Religious "school[s], college[s], universit[ies], or other educational institution[s]," which are "wholly or substantially owned [or] supported" by a religious entity or which have a curriculum "directed toward the propagation of a particular religion," can "hir[e] and employ[] employees of a particular religion." *Id.* § 20-605(a)(3).

- "[A]n employer, employment agency, or labor organization" can engage in discrimination if they are "observing the terms of a bona fide seniority system or any bona fide employee benefit plan, such as a retirement,

pension, or insurance plan, that is not a subterfuge to evade the purposes of this subtitle." *Id.* § 20-605(a)(4).

MFEPA is primarily enforced by the Maryland Commission on Civil Rights and the Attorney General of Maryland. The Commission is composed of nine members and represented by its general counsel. *Id.* §§ 20-202(a), 20-206(b). The Commission has the power to act against covered employers either in response to individual complaints it has received regarding potential MFEPA violations or "on its own motion" and "in its [own] name." *Id.* § 20-1004(a), (d). If the Commission finds probable cause for a violation of MFEPA, it may issue a charge against the employer. *Id.* §§ 20-1005(b), 20-1006(b). The charge can then be prosecuted as a civil action or in front of an administrative law judge. *Id.* § 20-1006(b). In 2023, the Commission received 46 complaints related to religious discrimination in employment. Compl. ¶ 76(d). In that same year, the Commission obtained over $1,000,000 in total monetary relief across all its cases. *Id.* The Attorney General also has authority to investigate and prosecute violations of MFEPA. Compl. ¶¶ 54-55.

### D. MFEPA's religious exemption

Maryland law has long allowed religious employers to consider religious affiliation in making employment decisions. As MFEPA states, the law "does not apply to" a "religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion, sexual orientation, gender identity, or military status to perform work connected with the activities of the religious entity." Md. Code, State Gov't § 20-604(2). And until recently, the Maryland Supreme Court had confirmed that this religious exemption is "broad" and "does not prohibit discrimination by religious organizations based on religious creed." *Montrose Christian Sch. Corp. v. Walsh,* 770 A.2d 111, 120 (Md. 2001). Religious entities like Plaintiffs have therefore relied on this religious exemption to hire only individuals

7

who share their faith and who are committed to their religious mission—regardless of their job title or responsibilities.

### E. The Maryland Supreme Court's restrictive reading

In *Doe v. Catholic Relief Services*, however, the Maryland Supreme Court rewrote MFEPA's religious exemption, giving it the "narrowest reasonable reading." *Doe v. Catholic Relief Servs.*, 300 A.3d 116, 132 (Md. 2023). The court held the MFEPA's religious exemption now only covers employees performing work that "directly further[s] the core mission (or missions) of the religious entity." *Id.* at 132. And in making this determination, the court explained that: (1) this new test is a "fact-intensive inquiry that requires consideration of the totality of the pertinent circumstances"; (2) employees that *indirectly* further the organization's mission (specifically citing "janitors") are *not* covered; (3) "the size of the religious entity may be relevant"; (4) "a religious entity may have both religious and secular core missions, and more than one of each"; and (5) the "court may consider, among other things: the description of its mission(s) that the entity provides to the public and/or regulators; the services the entity provides; the people the entity seeks to benefit; and how the entity's funds are allocated." *Id.* at 136-37.

*Catholic Relief Services* also made clear that the Commission and lower courts are now free to overrule a religious organization's own understanding of its religious mission. *Id.* at 136-37 & n.20 ("While a religious entity may genuinely subscribe to the tenet that all of its employees' work – no matter the nature of their duties – is inextricably intertwined with the values of its religion, …. [c]ourts must analyze the activities of a religious entity in determining the core mission(s) of the entity for the purpose of applying the exemption."). In short, after *Catholic Relief Services*, some positions—like a janitor—are categorically excluded from MFEPA's religious exemption, while most other positions are now subject to an open ended "fact-intensive inquiry" performed by secular courts independent of the religious

8

organization's own understanding of its religious mission and of the employee's role in advancing that mission. *Id*. at 136.

### F. Plaintiffs' religious exercise conflicts with MFEPA

Plaintiffs' hiring practices conflict with *Catholic Relief Services'* reinterpretation of MFEPA. Plaintiffs require *all* employees to be members in regular standing of the Church—regardless of their job title and responsibilities. *Id*. at 137. Indeed, Plaintiffs are currently soliciting applications for positions available only to those who share their religious beliefs, and Plaintiffs plan to continue hiring employees consistent with their sincere religious beliefs described above. Plaintiff General Conference, for example, recently released a new job posting for an assistant manager position. Although the position's main responsibilities relate to facilities management, the job posting makes clear that the employee "[m]ust be a member in regular standing of the Seventh-day Adventist Church" and have "[e]xtensive knowledge of principles, policies and beliefs of the General Conference and the Seventh-day Adventist Church." Compl. ¶ 74. As the Maryland Supreme Court held in *Catholic Relief Services*, this assistant manager position would not be covered by MFEPA's religious exemption because the position's responsibilities relate primarily to facilities management. *See* 300 A.3d at 136 (A "janitor who cleans the headquarters office of a religious entity" only "indirectly furthers the core mission of the religious entity."). Plaintiffs' religious hiring practices therefore directly conflict with MFEPA's recently narrowed religious exemption.

### LEGAL STANDARD

A preliminary injunction is appropriate "where the plaintiff has established 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Dmarcian, Inc. v. Dmarcian Eur. BV*, 60 F.4th 119, 138 (4th Cir. 2023).

## ARGUMENT

## I.  Plaintiffs are likely to succeed on the merits of their claims.

The First Amendment triply protects Plaintiffs' freedom to employ only those who share their religious beliefs. *First*, the doctrine of church autonomy protects Plaintiffs' ability to make internal management decisions—including employment-related decisions—rooted in sincere religious belief. *Second*, both Religion Clauses prohibit "excessive entanglement" between church and state. And, as the Fourth Circuit has previously held, interfering with the religious hiring practices of a church is the consummate example of excessive entanglement. *Third*, the Free Exercise Clause requires that courts apply strict scrutiny to burdens on religious exercise that are not generally applicable. And here, MFEPA exempts a host of other Maryland employers and employment practices from its coverage—confirming the law is not generally applicable. Having triggered strict scrutiny by burdening Plaintiffs' religious exercise, Defendants also cannot hope to satisfy it. Plaintiffs are therefore likely to succeed on the merits.

## A.  MFEPA violates Plaintiffs' church autonomy rights (Count I).

Application of MFEPA to Plaintiffs' religiously mandated hiring practices violates the Religion Clauses' fundamental guarantee of noninterference in religious questions (commonly called the church autonomy doctrine). The First Amendment ensures that religious organizations remain free "from secular control or manipulation" and "free from state interference" in "matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). These protections flow from both Religion Clauses: "State interference in [matters of faith and doctrine] would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment." *Our Lady of Guadalupe Sch. v. Morrisey-Berru*, 591

U.S. 732, 746 (2020); *see also Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188-89 (2012) (Free Exercise Clause "protects a religious group's right to shape its own faith and mission through its appointments" while Establishment Clause "prohibits government involvement in such ecclesiastical decisions").

Under the church autonomy doctrine, a state may not obtain "conformity" in matters of "faith, doctrine, ritual, communion, discipline, canon law, traditions and usages" of a particular faith by "legislative fiat and subject to legislative will." *Kedroff*, 344 U.S. at 107-08. Instead, "courts must defer to the decisions of religious organizations 'on matters of discipline, faith, internal organization, or ecclesiastical rule, custom or law.'" *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 330-31 (4th Cir. 1997) (quoting *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713 (1976)). MFEPA violates Plaintiffs' church autonomy by attempting to outlaw, by judicial reinterpretation, Plaintiffs' religiously mandated practice of hiring only those who share their faith.

Courts have long held that the church autonomy doctrine protects religious groups' decisions to employ—and by extension, to commune with—only those who agree to support and uphold their faith. The Fourth Circuit has routinely held that the ministerial exception (one component of the church autonomy doctrine) "bar[s] the government from interfering with ministerial employment decisions or involving itself in ecclesiastical matters." *Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316, 326 (4th Cir. 2024) (cleaned up); *see also id.* at 332-33 (dismissing Title VII suit by drama teacher at Catholic high school); *EEOC v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795 (4th Cir. 2000) (dismissing Catholic school choir director's Title VII claim); *Rayburn v. Gen. Conf. of Seventh-day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985) (stating that court "may no more require a minimum basis in doctrinal reasoning than it may supervise doctrinal content" and dismissing Title VII claim

11

pertaining to church hiring decision). And courts have made equally clear that this "constitutional protection extends beyond the selection of clergy to other internal church matters." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 656 (10th Cir. 2002); *Our Lady*, 591 U.S. at 747 (defining "the general principle of church autonomy" as "independence in matters of faith and doctrine and in closely linked matters of internal government"); *Bell*, 126 F.3d at 333 (decision to withhold funding from religious ministry "falls within the ecclesiastical sphere that the First Amendment protects from civil court intervention"); *see also Diocese of Raleigh,* 213 F.3d at 800 (recognizing that the ministerial exception is just one component of the broader "independence … of religious bodies in accordance with the dictates of the First Amendment").

The key question for determining if these church autonomy protections apply in a particular case is whether the relevant decision is "rooted in religious belief." *Bryce*, 289 F.3d at 657 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)). This is particularly true in cases of church membership and church employment. When a church member, employee, or prospective employee fails to meet "the standard of morals" required of "members of the church," the church autonomy doctrine protects the religious group's decision to no longer employ or associate with that individual. *Milivojevich*, 426 U.S. at 713-14.

This church autonomy principle is thus distinct from the ministerial exception as it protects membership and employment decisions *rooted in religious beliefs* but applies to *all* Church members and employees—not just ministers. *See Curay-Cramer v. Ursuline Acad. of Wilmington*, 450 F.3d 130, 140 (3d Cir. 2006) (dismissing Title VII claim where claim "would require an analysis of Catholic doctrine" without considering whether employee was a minister); *Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163, 1174, 1185 (D. Colo. 2023) (protecting religiously motivated employment decisions for non-ministers from imposition of non-

discrimination standards); *Butler v. St. Stanislaus Kostka Catholic Acad.*, 609 F. Supp. 3d 184, 204 (E.D.N.Y. 2022) (church autonomy doctrine prevented court or jury from evaluating proffered religious reason for termination even if employee were not a minister); *Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 872 (N.D. Ill. 2019) (church autonomy doctrine barred claims when "alleged reasons for firing [plaintiff] were rooted firmly in its religious beliefs" even where ministerial exception did not apply); *Aparicio v. Christian Union, Inc.*, No. 18-cv-592, 2019 WL 1437618, at *9 (S.D.N.Y. Mar. 29, 2019) (First Amendment prohibited Title VII claim for retaliation based on employee's disagreement with complementarian theology, even where employee was not a minister.).

Selecting faithful representatives is critical for all religious bodies, which is why there is hardly a "clearer example of an intrusion into the internal structure or affairs" of a religious group than to "force[] the group to accept members it does not desire." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 861-63 (7th Cir. 2006). And what is true of all members is even more true of employees, who represent the church publicly and carry out its work. Indeed, it is these precise "constitutional questions" that led Congress to create "the explicit exemptions of Title VII," MFEPA's federal counterpart, "to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices, whether or not every individual plays a direct role in the organizations['] religious activities." *Curay-Cramer*, 450 F.3d at 140, 141 (quoting *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991)).

As reinterpreted by *Catholic Relief Services*, MFEPA impermissibly interferes with the Church's internal decision making "on matters of discipline, faith, [and] internal organization." *Bell*, 126 F.3d at 330-31. For example, *Catholic Relief Services* directs secular courts to determine the "core" mission of a religious entity, and then prohibits religious entities—including churches—from requiring employees to share

their faith unless the employees "directly" further that mission. 300 A.3d at 136. But the Religious Clauses "protect[ ] a religious group's right to shape its own faith and mission *through* its appointments." *Hosanna-Tabor*, 565 U.S. at 188 (emphasis added). And "[d]etermining that certain activities are in furtherance of an organization's religious mission, and that only those committed to that mission should conduct them, is thus a means by which a religious community defines itself." *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., joined by Marshall, J., concurring in judgment); *see also Behrend v. S.F. Zen Ctr., Inc.*, 108 F.4th 765, 770 n.3 (9th Cir. 2024) ("entanglement concerns that undergird" church autonomy defense required court to "defer to" Buddhist Zen Center's view that employee's "maintenance, kitchen, and guest services" duties "are, by nature, religious"). *Catholic Relief Services* thus requires civil courts to interfere in religious matters that are off limits under the church autonomy doctrine.

Maryland's reinterpretation of MFEPA's religious exemption also means that some roles (including janitorial positions, *see Catholic Relief Servs.,* 300 A.3d at 136) will almost always fall *outside* the protection of MFEPA's religious exemption. But Plaintiffs (like many other religious organizations) believe that hiring only those who share their faith, regardless of the employee's role, is critical to the success of their religious mission. Compl. ¶ 3. Applying MFEPA to Plaintiffs' mission-aligned hiring thus puts the Commission and secular courts in the position of rewriting Plaintiffs' religiously mandated hiring policies. MFEPA, as reinterpreted by *Catholic Relief Services*, effectively tells Plaintiffs that their religious beliefs about hiring are wrong and that their religious hiring must be cabined to certain court-approved roles. This attempt to override Plaintiffs' mission-aligned hiring by imposing penalties on this religious exercise further violates the church autonomy doctrine.

Indeed, *Catholic Relief Services* even has ramifications for how religious employers like Plaintiffs discipline Church members. For example, while Church

14

doctrine states that removal from denominational employment may be an appropriate sanction for transgressing fundamental Seventh-day Adventist standards of conduct, *see* Compl. ¶ 38, MFEPA now prohibits such discipline for employees who are not ministers. But this infringes on a longstanding principle of the church autonomy doctrine, that civil courts "have no power" to entertain lawsuits challenging "ordinary acts of church discipline, or of excision from membership." *Bouldin v. Alexander*, 82 U.S. (15 Wall.) 131, 139 (1872). Such disciplinary decisions "undoubtedly involve[] a complex balancing of spiritual and pragmatic considerations, all properly left to the highest church authority, not civil courts." *Askew v. Trs. of Gen. Assembly of Church of Lord Jesus Christ of Apostolic Faith Inc.*, 684 F.3d 413, 420 (3d Cir. 2012); *see also e.g.*, *Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 819 F.2d 875, 883 (9th Cir. 1987) ("Courts generally do not scrutinize closely the relationship among members … of a church.").

Plaintiffs are now prohibited from asking all employees who work on behalf of the Church to be members of the Church in regular standing, despite their sincere religious belief that "God's work is to be jealously safeguarded" and that employees should model an "exemplary commitment to the Lord and the teaching of His Church." Compl. ¶¶ 26, 27. MFEPA's dictates thus directly interfere with Plaintiffs' mission-aligned hiring practices, which are motivated by "faith and doctrine" and part of the "sphere" of protected "internal management decisions that are essential to the institution's central mission." *Our Lady*, 591 U.S. at 746. This interference violates the church autonomy doctrine and must be enjoined.

### B. MFEPA excessively entangles the State in Plaintiffs' religious decision-making in violation of the Religious Clauses (Count II).

The First Amendment also prohibits "subject[ing] church employment decisions" to secular "scrutiny" when doing so would "give rise to 'excessive government entanglement' with religious institutions." *Rayburn*, 772 F.2d at 1169; *see also Does*

*1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1271 (10th Cir. 2024) (entanglement concerns implicated by "governmental monitoring or second-guessing of religious beliefs and practices") (cleaned up). Distinct from the doctrine of church autonomy, excessive entanglement is primarily concerned with the way in which secular courts interact with religious organizations and approach religious questions. "[T]he very process of inquiry," not just "the conclusions that may be reached" when secular law is applied to religious entities, can "impinge on rights guaranteed by the Religion Clauses." *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 502 (1979).

This constitutional doctrine, rooted in both Religion Clauses, ensures courts don't get involved in disputes over religious doctrine or belief. *See Walz v. Tax Comm'n of City of N.Y.*, 397 U.S. 664, 670 (1970) ("Religion Clauses" created "to mark boundaries to avoid excessive entanglement."); *Carson v. Makin*, 596 U.S. 767, 787 (2022) ("scrutinizing whether and how" a religious entity pursues its "mission would also raise serious concerns about state entanglement with religion"); *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969) (forbidding civil courts from resolving controversies over religious doctrine or practice); *Milivojevich*, 426 U.S. at 709 (citing danger that secular courts will "become entangled in essentially religious controversies" as reason why "the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes"); *Catholic Bishop*, 440 U.S. at 501-02 (citing entanglement concerns to reject imposition of collective bargaining regime on Catholic schools).

How does a court determine whether application of a secular law to a religious entity becomes entangling? The Fourth Circuit has answered this question, explaining that "entanglement is measured by" (1) "the 'character and purposes' of the institution affected," (2) "the nature of the benefit or burden imposed," and (3) "the 'resulting relationship between the government and the religious authority.'" *Rayburn*, 772 F.2d at 1170; *see also id.* at 1170 n.8 (recognizing that this

16

"framework … seems well suited to questions which involve the relationship of government to religious institutions").

*First*, regarding "the 'character and purposes' of the institution affected," application of MFEPA to "the church itself" raises (as the Fourth Circuit has already held) the "most sensitive" entanglement concerns because "the church is fundamentally spiritual, and the danger of 'interaction between church and state,' is what the establishment clause protects against." *Id.* at 1170 (internal citation omitted). Indeed, the dispositive entanglement concerns that arose in *Catholic Bishop* when secular laws were applied to "church-related schools" (not even to the church itself) makes this an *a fortiori* case. 440 U.S. at 503 ("The *substantial religious character* of these church-related schools gives rise to entangling church-state relationships of the kind the Religion Clauses sought to avoid." (emphasis added)). And the Fourth Circuit in *Rayburn* agreed: "If the dangers of entanglement were severe with respect to parochial schools, they are all the more serious with respect to the church itself." *Rayburn*, 772 F.2d at 1170 (citations omitted). Because MFEPA would be enforced directly against the Church's governing body and a closely affiliated ministry, this factor plainly points toward excessive entanglement.

*Second*, turning to the "nature of the benefit or burden imposed," *Rayburn* flagged two types of burdens—procedural and substantive. Regarding procedural burdens, the court explained that "entanglement might … result from a protracted legal process pitting church and state as adversaries." *Rayburn*, 772 F.2d at 1171. And the court specifically flagged the procedural entanglement that would arise from "[p]ervasive monitoring" and "lengthy proceeding[s], involving state agencies and commissions," as well as "the federal trial courts and courts of appeal," all as part of the "panoply of legal process designed to probe the mind of the church." *Id.*; *see also EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 467 (D.C. Cir. 1996) ("[T]he EEOC's two-year investigation … , together with the extensive pre-trial inquiries and the trial

17

itself, constituted an impermissible entanglement with judgments that fell within the exclusive province of the Department of Canon Law as a pontifical institution."). Plaintiffs here similarly face the full weight of coercive government investigative authority via MFEPA's application to their hiring practices—including civil investigations, depositions, document discovery, protracted legal disputes, and more. *Supra* 7; Compl. ¶¶ 47-48, 54.

Turning to substantive burdens, *Rayburn* pointed to the various "remedies," including financial penalties, that could be imposed by courts—which it described as "far-reaching in their impact upon religious organizations"—as another form of excessive entanglement. 772 F.2d at 1171. It also pointed to the costs related to post-litigation "compliance" and the "continued court surveillance of the church's policies and decisions" as further examples of the ongoing financial and administrative costs associated with this kind of judicial interference. *Id.* The same is true here. Plaintiffs could face, in addition to the burdens of litigation, stiff financial penalties if found liable for violating MFEPA in addition to post-litigation monitoring and compliance costs. Moreover, enforcement of MFEPA would burden Plaintiffs by forcing them to make future employment decisions "with an eye to avoiding litigation" rather than based on their sincere religious beliefs. *Id.*

Subjecting religious entities to legal actions, imposing financial penalties on religious entities for noncompliance, and using the law to coerce them to disregard or downplay their religious beliefs are undoubtedly serious burdens on religious exercise—confirming that this factor points toward excessive entanglement.

*Third*, considering the "resulting relationship between the government and the religious authority," *Rayburn* pointed to the conflicts that could result if the government attempted to interfere with the religiously informed hiring practices of a church. 772 F.2d at 1170 ("It is axiomatic that the guidance of the state cannot substitute for that of the Holy Spirit and that a courtroom is not the place to review

a church's determination of 'God's appointed.'"); *id.* at 1170 n.7 ("The dangers of entanglement are posed where there exists a continuing close administrative relationship in core areas of faith that poses the possibility of secular approval granted or withheld from religious denominations."). *Rayburn* then concluded that "application of Title VII to employment decisions of this nature would result in an *intolerably close relationship* between church and state." *Id.* at 1170 (emphasis added); *see also Duquesne Univ. of the Holy Spirit v. NLRB*, 947 F.3d 824, 829 (D.C. Cir. 2020) ("[I]f a school took action against teachers for failing to comply with religious principles, an ensuing unfair-labor-practice proceeding … would entangle the Board in the 'terms and conditions of employment' of teachers, which would involve the Board in 'nearly everything that goes on' in religious schools.").

The same is true here. Application of MFEPA would require government involvement in all aspects of Plaintiffs' employment practices. To determine whether Plaintiffs qualify for a religious exemption, the Commission (and then the courts) would have to assess, in each instance, whether the "employee's duties … directly further the core mission(s) – religious or secular, or both – of the religious entity." *Catholic Relief Servs.*, 300 A.3d at 136. And in doing so, they would have to evaluate (1) "the goals of the entity," (2) whether certain job duties are "directly" or "indirectly" related to those goals; (3) whether the organization's size affects the analysis; (4) who the organization "seeks to benefit" and (5) how the organization spends its money. *Id.* at 136-37. Secular authorities would thus have to sift through all aspects of Plaintiffs' ministry to perform this entangling analysis. *See Amos*, 483 U.S. at 336 ("[I]t is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious. The line is hardly a bright one, and an organization might understandably be concerned that a judge would not understand its religious tenets and sense of mission."); *id.* at 343 (Brennan, J., joined by Marshall, J., concurring in judgment) (Because

determining whether certain activities are either religious or secular is not "self-evident," the resulting "case-by-case analysis" necessarily "results in considerable ongoing government entanglement in religious affairs.").

Moreover, conflict would inevitably result from this government involvement. By asking secular authorities to second-guess a church's theological judgments about its mission and the role of its employees, *Catholic Relief Services*, 300 A.3d at 137 & n.20, the government is now empowered (on pain of legal liability) to determine when, where, and how Plaintiffs' religious beliefs can inform their hiring decisions—the epitome of an intolerably close relationship between church and state. *See Rayburn*, 772 F.2d at 1171 ("Bureaucratic suggestion in employment decisions of a pastoral character, *in contravention of a church's own perception of its needs and purposes,* would constitute unprecedented entanglement with religious authority[.]") (emphasis added). This final factor also points strongly toward unconstitutional entanglement.

All three factors from *Rayburn* point to excessive entanglement. This Court should therefore enjoin enforcement of MFEPA against Plaintiffs' mission-aligned employment practices.

\*   \*   \*

While the Maryland Supreme Court might have thought it created a test that avoided the "theological thicket," *Catholic Relief Services*, 300 A.3d at 136, it did the opposite: it created a "fact intensive," multi-factor, malleable standard that *requires* the Commission and secular courts to delve into the theological details of a religious organization's operations and explicitly calls on courts to *second-guess* religiously motivated employment policies. As the First Circuit has explained, courts "cannot avoid entanglement by creating new, finely spun judicial distinctions that will themselves require further court or [Commission] 'entanglement' as they are administered*." Universidad Central de Bayamon v. NLRB*, 793 F.2d 383, 402-03 (1st Cir. 1985).

### C. MFEPA violates Plaintiffs' Free Exercise rights (Count III).

The Free Exercise Clause subjects to strict scrutiny laws that burden religious exercise and that are either not neutral or not generally applicable. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022). Here, there is no question that prohibiting Plaintiffs' mission-aligned employment practices burdens their religious exercise, or that MFEPA lacks general applicability because it permits comparable secular exceptions. Triggering strict scrutiny, MFEPA fails this demanding constitutional standard.

### 1. Preventing Plaintiffs from hiring employees who share their faith burdens Plaintiffs' religious exercise.

Plaintiffs' religious exercise includes creating a community and workplace composed of those who share their faith. This is why Plaintiffs require all employees—regardless of their job title and responsibilities—to be baptized, tithe-paying members in regular standing with the Church. Compl. ¶ 26. But MFEPA forbids this religious exercise, instead requiring Plaintiffs to hire certain employees without regard to whether those employees are members of the Church in good standing. This prohibition of Plaintiffs' religious exercise is *a fortiori* a burden on religious exercise. *See, e.g.*, *Mahmoud v. McKnight*, 102 F.4th 191, 208 (4th Cir. 2024) ("a burden exists whenever government conduct either compels a violation of conscience or puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." (cleaned up); *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981) (same).

### 2. MFEPA's nondiscrimination requirements are not generally applicable.

A law ceases to be "generally applicable, and therefore trigger[s] strict scrutiny" when it either treats "comparable secular activity more favorably than religious exercise," *Tandon v. Newsom*, 593 U.S. 61, 62 (2021), or "invites the government to consider the particular reasons for a person's conduct by providing a mechanism for

individualized exemptions," *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021) (cleaned up). "[W]hether two activities are comparable … must be judged against the asserted government interest that justifies the regulation at issue." *Tandon*, 593 U.S. at 62; *Fulton*, 593 U.S. at 534 ("A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way."). MFEPA fails under both *Tandon* and *Fulton*: it treats comparable secular activity more favorably by granting categorical exceptions from its nondiscrimination requirement and by permitting individualized exceptions from the same.

*Categorical exceptions.* MFEPA creates at least four categories of exceptions from its nondiscrimination requirement: first, it exempts employers with less than fifteen employees, Md. Code, State Gov't § 20-601(d)(i)(2); second, it exempts "bona fide private membership club[s] … exempt from taxation under § 501(c) of the Internal Revenue Code," *id.* at § 20-601(d)(3); third, it allows religious "school[s], college[s], and universit[ies]" controlled by a religious entity or "directed toward the propagation of a particular religion," to hire and employ only "employees of a particular religion," *id.* at § 20-605(a)(3); and fourth, it exempts employers if they are "observing the terms of a bona fide seniority system or any bona fide employee benefit plan … that is not a subterfuge to evade the purposes of this subtitle," *id.* § 20-605(a)(4). These categorical exceptions from MFEPA's religious nondiscrimination requirement—exempting well over 80% of Maryland employers[1]—undermine the government's interest in preventing religious discrimination in the same way as (and to a *much greater* degree than) granting Plaintiffs a religious accommodation. These exceptions trigger strict scrutiny. *Tandon*, 593 U.S. at 62 (treating "*any* comparable

---

[1]    *2021 SUSB Annual Data Tables by Establishment Industry: U.S. and States, NAICS, detailed employment*, U.S. Census Bureau (Dec. 21 2023), https://perma.cc/PQ57-M474 (dividing Maryland total firms by the sum enterprises with <5, 5-9, and 10-14 employees).

secular activity more favorably than religious exercise" triggers strict scrutiny); *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F. 4th 664, 686, 689 (9th Cir. 2023) (en banc) (categorical exceptions trigger strict scrutiny under "bedrock" constitutional principles).

**Individualized discretion.** The Commission also has discretion to grant case-by-case exceptions from MFEPA's religious nondiscrimination requirement. As MFEPA itself explains, the law "does not prohibit" hiring decisions based on "sex, age, religion, national origin, disability, or military status" when those characteristics are "bona fide occupational qualification[s] reasonably necessary to the normal operation of that business or enterprise." Md. Code, State Gov't § 20-605(a)(1). Determining whether a BFOQ is "reasonably necessary" to an employer's "normal operation," however, is an inherently discretionary, case-by-case determination that puts significant discretionary authority in the Commission's hands to apply and enforce this broadly worded standard. *See, e.g.*, *Everson v. Mich. Dep't of Corr.*, 391 F.3d 737, 760 (6th Cir. 2004) (recognizing "the case-by-case nature of the BFOQ analysis"). This discretion to determine whether an exception to MFEPA is "reasonably necessary" to an employer's "normal operation" also triggers strict scrutiny.

### 3. MFEPA's prohibition on mission-aligned hiring cannot satisfy strict scrutiny.

"[S]trict scrutiny requires the government to further 'interests of the highest order' by means 'narrowly tailored in pursuit of those interests.'" *Tandon*, 593 U.S. at 64-65 (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)). But MFEPA's interest in preventing discrimination is neither compelling as applied to Plaintiffs, nor does MFEPA further this asserted interest by means least restrictive of religious exercise.

Even assuming the government's interest in preventing religious discrimination is important in the abstract,[2] strict scrutiny does not permit it to rely on such "broadly formulated interests" when denying religious accommodations. *Fulton*, 593 U.S. at 541. The inquiry is not whether Defendants "have a compelling interest in enforcing non-discrimination policies generally, but whether they have such an interest in denying an exception" to Plaintiffs specifically. *Id.* And here, no such showing can be made. First, MFEPA's numerous secular exceptions—already covering large swaths of Maryland's workforce—belie Defendants' claimed interest in enforcing MFEPA against Plaintiffs. *See id.* at 542 ("The creation of a system of exceptions … undermines the [Defendants'] contention that its non-discrimination policies can brook no departures."); *Espinoza v. Mont. Dep't of Rev.*, 591 U.S. 464, 486 (2020) ("A law does not advance 'an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited.'") (quoting *Lukumi*, 508 U.S. at 547). Indeed, MFEPA's fifteen-employee threshold exempts roughly 80% of employers in Maryland, and its exception for certain religious schools, colleges, and universities is constitutionally indistinguishable from the religious accommodation Plaintiffs seek here. *Cf. Rayburn*, 772 F.2d at 1170 (constitutional concerns "all the more serious" when Title VII is applied to churches rather than religious schools). Because Defendants have "fail[ed] to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort," their "interest given in justification of the restriction [on Plaintiffs' religious exercise] is not compelling." *Lukumi*, 508 U.S. at 546-47.

Nor is outlawing Plaintiffs' mission-aligned hiring the least restrictive means of advancing this asserted interest. Laws that are "overbroad or underinclusive in

---

[2]    The Church disputes the implication in *Catholic Relief Services* that their long-held religious beliefs and religiously motivated hiring practices might constitute the type of unlawful "discrimination" MFEPA was intended to cover.

substantial respects" fail this prong of strict scrutiny. *Id.* at 546. Thus, even assuming a compelling interest in preventing religious discrimination, MFEPA is incredibly underinclusive: As noted earlier, MFEPA does not apply to roughly 80% of all employers in Maryland—not to mention its exceptions for private membership clubs, for employment decisions based on bona fide occupational qualifications, and for certain religious schools. A law shot through with that many exceptions is so underinclusive that enforcing it against Plaintiffs *cannot* be the approach least restrictive of religious exercise.

The experience of other states and the federal government also confirms that Maryland can achieve its interest in preventing invidious religious discrimination without restricting Plaintiffs' religiously motivated hiring practice. As the Supreme Court has explained, when "so many" other jurisdictions accommodate a particular religious exercise, the government "must, at a minimum, offer persuasive reasons why it believes that it must take a different course." *Holt v. Hobbs*, 574 U.S. 352, 369 (2015); *Mast v. Fillmore County*, 141 S. Ct. 2430, 2433 (2021) (Gorsuch, J., concurring) (When other governments can accommodate religious exercise, the defendant "bore the burden of presenting a 'compelling reason why' it cannot offer the [plaintiff] this same alternative." (quoting *Fulton*, 593 U.S. at 542)).

Of the thirty-eight states and the District of Columbia that have a state-law employment nondiscrimination requirement and an explicit religious exemption, Plaintiffs are only aware of two states—Maryland and Washington—that have reinterpreted their state statutes to forbid co-religionist hiring preferences. And, by Plaintiffs' count, 31 states, the District of Columbia, and the United States government today either don't regulate employment discrimination at all or have a statutory religious exemption that, as written, would likely cover Plaintiffs' co-

religionist hiring practices.[3] That so many other jurisdictions can advance their interest in preventing religious employment discrimination without burdening Plaintiffs' religious exercise confirms Maryland could too.

Finally, the government fails to satisfy strict scrutiny because it cannot point to an "'actual problem' in need of solving." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011); *see Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council*, 683 F.3d 539, 556 (4th Cir. 2012) (same), *rev'd on other grounds*, 721 F.3d 264 (4th Cir. 2013) (en banc). Prior to *Doe*, MFEPA for decades exempted Plaintiffs' mission-aligned hiring practice. *See, e.g., Montrose Christian*, 770 A.2d at 120 ("[S]tate law, like its federal counterpart, does not prohibit discrimination by religious organizations based on religious creed."). And there is no indication that the prior scheme did not serve the state's asserted interest in religious non-discrimination, nor is there any indication that the state legislature considered this particular exemption problematic. Rather, the Maryland Supreme Court reinterpreted the law *sua sponte* without evidence of an actual problem. Absent evidence of an "actual problem" this change was designed to solve, MFEPA cannot survive strict scrutiny as applied to Plaintiffs. *Brown*, 564 U.S. at 799.

## II. The other preliminary injunction factors are met.

In addition to showing a likelihood of success on the merits, a preliminary injunction is warranted when plaintiffs demonstrate they are likely to suffer

---

[3]  Alabama (no law); Arizona (Ariz. Rev. Stat. § 41-1462); Arkansas (Ark. Rev. Stat. § 16-123-103); California (Cal. Gov't Code § 12940(j)(4)(B)); Colorado (Colo. Rev. Stat. § 24-34-402(6)); District of Columbia (D.C. Code § 2-1401.03(b)); Florida (Fla. Stat. § 760.10(9)); Hawaii (Haw. Stat. § 378-3(5)); Indiana (Ind. Code § 22-9-5-22); Iowa (Iowa Code § 216.6(6)(d)); Maine (Me. Stat. 5 § 4573-A(2)); Massachusetts (Mass. Stat. 151B § 4(18)); Minnesota (Minn. Stat. § 363A.26); Mississippi (no law); Missouri (Mo. Stat. § 213.010(8)); Montana (Mont. Stat. § 49-2-101(11)); New Hampshire (N.H. Rev. Stat. § 354-A:18); New Jersey (N.J. Stat. § 10:5-12(a)); New Mexico (N.M. Stat. § 28-1-9(B)); New York (N.Y. Exec. Law § 296(11)); North Carolina (no law); Ohio (Ohio Stat. § 4112.02(O)); Pennsylvania (43 Pa. Stat. § 955(10)); Rhode Island (R.I. Stat. § 28-5-6(9)(ii)); South Carolina (S.C. Stat. § 1-13-80(I)(5)); South Dakota (S.D. Stat. § 20-13-18); Texas (Tex. Lab. Code § 21.109); United States (42 U.S.C. § 2000e-1(a)); Utah (Utah Stat. § 34A-5-102(1)(i)(ii)); Vermont (Vt. Stat. tit. 21, § 495(e); Virginia (Va. Code § 2.2-3905(E)); Wisconsin (Wis. Stat. § 111.337(2)(a)); Wyoming (Wyo. Stat. § 27-9-102(b)).

irreparable harm in the absence of a preliminary injunction, that the balance of equities tips in their favor, and that an injunction is in the public interest. *Dmarcian, Inc.*, 60 F.4th at 138. Plaintiffs easily satisfy these remaining factors.

**Irreparable harm.** "[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim." *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009). This is because—as both the Supreme Court and the Fourth Circuit have emphasized— "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020); *see also Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013) (same); *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011) (same).

Here, Plaintiffs face irreparable harm because MFEPA deprives them of their rights under the Religion Clauses of the First Amendment. Plaintiffs are forced to give up their religiously motivated hiring practices or risk liability under MFEPA. Indeed, the General Conference risks liability today by soliciting applications for roles that are only open to Church members in regular standing. *See* Compl. ¶ 73. And going forward, both Plaintiffs must continue hiring new employees consistent with their religious beliefs. MFEPA thus outlaws Plaintiffs' exercise of their First Amendment rights, and that loss of a First Amendment freedom is per se irreparable harm.

**Balance of equities and public interest.** The last two preliminary injunction factors—the balance of equities and public interest—"merge when the Government is the opposing party." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). In other words, "the government's interest *is* the public interest." *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 501

(D. Md. 2020) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)). And in this particular context, as the Fourth Circuit has repeatedly held, "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021). "If anything, the system is improved by such an injunction." *Id.* It is therefore "well-established that the public interest favors protecting constitutional rights." *Id.*

Here, these factors favor an injunction. Plaintiffs have engaged in mission-aligned hiring for years, and it wasn't until last year that this suddenly became illegal under *Catholic Relief Services*. The government is not substantially harmed by an injunction that temporarily halts enforcement of this new interpretation of MFEPA against Plaintiffs and simply allows Plaintiffs to carry on with hiring practices that have been permitted for decades under Maryland law. Indeed, it was the Maryland Supreme Court, not even the judgment of the legislature, that imposed this new requirement. The government will therefore suffer little harm in delaying a judicially imposed policy change, particularly where MFEPA's reinterpretation intrudes on Plaintiffs' First Amendment rights and the government is already willing to live with numerous other exceptions from the law. *Supra* 6-7. The balance of the equities thus favors an injunction.

## III.   Plaintiffs have standing to challenge MFEPA.

Plaintiffs also have standing to challenge MFEPA's prohibition on mission-aligned hiring. To show injury at this stage in the litigation, a plaintiff must attest to facts sufficient to show that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct ... and (3) that is likely to be redressed by a favorable judicial decision." *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018). And in First Amendment cases such as this one, the Fourth Circuit has recognized that these

"standing requirements are somewhat relaxed." *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013).

The fear and risk of future enforcement can satisfy the injury-in-fact requirement when "plaintiffs [1] allege 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but [2] proscribed by a statute, and [3] there exists a credible threat of prosecution thereunder.'" *Kenny*, 885 F.3d at 288. Plaintiffs easily meet this standard.

*First*, because Plaintiffs' hiring policies are a sincere religious exercise and protected by the Religion Clauses, they are inarguably affected with constitutional interest. *See supra* 4-5; *Kenny*, 885 F.3d at 288 (policies limiting First Amendment rights satisfy this requirement); *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 603 (8th Cir. 2022) (plaintiffs exercise of "religious beliefs protected by the First Amendment" are affected with constitutional interest).

*Second*, Plaintiffs' hiring practices are proscribed by the operative interpretation of MFEPA. Plaintiffs require that all employees be baptized, tithe-paying members in regular standing, regardless of job title or duties. But MFEPA does not allow Plaintiffs to require employees who do not "perform duties that directly further the core mission" to share their faith or adhere to faith-based personal conduct standards. *Catholic Relief Servs.*, 300 A.3d at 132. Plaintiffs do not intend to change their hiring policies and plan to continue to apply their terms of employment to all employees. Compl. ¶ 73. MFEPA thus proscribes Plaintiffs' conduct. *See Catholic Relief Servs.*, 300 A.3d at 136 (pointing to a janitorial employee as an example of someone *not* covered by MFEPA's religious exemption as reinterpreted).

*Third*, Plaintiffs face a credible threat of enforcement. As is the case here, the existence of a "non-moribund statute … presents such a credible threat … in the absence of compelling evidence to the contrary." *Cooksey*, 721 F.3d at 237. And "[t]his presumption is particularly appropriate when the presence of the statute tends to

29

chill the exercise of First Amendment rights." *Id.*; *Kenny*, 885 F.3d at 288 (same). MFEPA satisfies this standard. Not only is it newly amended (suggesting future enforcement is likely), it is routinely enforced both by Defendants and private parties. *See* Compl. ¶¶ 76-78. Indeed, the Attorney General has already made clear his position that MFEPA's religious exemption does not apply to "employees who perform secular work for religious organizations," and that the statute only protects a religious organization's "freedom to believe," not its "freedom to act." Compl. ¶ 76(b); *see Kenny*, 885 F.3d at 288 ("Threat of prosecution is especially credible when defendants have not 'disavowed enforcement.'"). Plaintiffs thus satisfy the injury-in-fact requirement.

Plaintiffs also satisfy traceability: Plaintiffs' injuries are directly traceable to Defendants, as Defendants make up the state entities and officials charged with investigating and enforcing MFEPA. *See* Compl. ¶¶ 47-48, 54. Further, Plaintiffs seek an injunction preventing Defendants from exercising that authority, and thus Plaintiffs' injuries will be redressed by the requested relief. *See Cooksey*, 721 F.3d at 238 (injuries redressable where "[a] favorable decision on [plaintiff's] behalf would mean the [state agency] would be enjoined from enforcing" unconstitutional statute).

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for a preliminary injunction.

Dated: October 4, 2024

Respectfully submitted,

Todd R. McFarland
D. Md. Bar No. 28777
GENERAL CONFERENCE OF
SEVENTH-DAY ADVENTISTS
12501 Old Columbia Pike
Silver Spring, MD 20904
Tel.: (301) 680-6000
*mcfarlandt@gc.adventist.org*

/s/ Eric S. Baxter
Eric S. Baxter
D. Md. Bar No. 15640
Nicholas R. Reaves
D. Md. Bar No. 31293
Andrea R. Butler (pro hac vice pending)
THE BECKET FUND FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave, N.W.
  Suite 400
Washington, DC 20006
Tel.: (202) 955-0095
*ebaxter@becketlaw.org*

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2024, a copy of the Motion for Preliminary Injunction, Memorandum in Support of Motion for Preliminary Injunction, and Proposed Order, which were electronically filed in this case, were also emailed to civil_service@oag.state.md.us in accordance with Fed. R. Civ. P. 5(b)(2)(E), as the Attorney General of Maryland has consented to accept service of process on State officers sued in their official capacity via email. *See* Office of the Attorney General, *Announcement Regarding Service of Civil Complaints and Subpoenas* (July 19, 2024), https://www.marylandattorneygeneral.gov/Pages/Announcement_Service_of_Civi_Complaints_and_Subpoenas.pdf.


Dated: October 4, 2024                              /s/ Eric Baxter
                                                    Eric Baxter