# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS, *an unincorporated association*, *et al.*,

   *Plaintiffs*,

  v.

CLEVELAND L. HORTON, II, *in his official capacity as Acting Executive Director of the Maryland Commission on Civil Rights*, *et al.*,

   *Defendants*.

Case No. 8:24-cv-02866-TDC

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**Hearing Requested**

Eric S. Baxter
D. Md. Bar No. 15640
Nicholas R. Reaves
D. Md. Bar No. 31293
Andrea R. Butler (pro hac vice)
Kelsey Baer Flores (pro hac vice)
THE BECKET FUND FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave, N.W., Suite 400
Washington, DC 20006
(202) 955-0095
*ebaxter@becketlaw.org*

Todd R. McFarland
D. Md. Bar No. 28777
GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS
12501 Old Columbia Pike
Silver Spring, MD 20904
Tel.: (301) 680-6000
*mcfarlandt@gc.adventist.org*

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 3

I.  Plaintiffs are likely to succeed on the merits. .............................................................. 3

    A.  MFEPA violates church autonomy (Count I). ...................................................... 3

    B.  MFEPA excessively entangles the State in religious
        decision-making (Count II). .................................................................................. 7

    C.  MFEPA violates Plaintiffs' Free Exercise rights (Count III). ........................... 10

        1.  MFEPA's anti-discrimination requirement is not generally applicable. ...... 10

        2.  MFEPA's prohibition on mission-aligned hiring cannot satisfy
            strict scrutiny. ............................................................................................... 13

II.  The remaining preliminary injunction factors are easily satisfied. ........................... 16

    A.  Irreparable Harm ................................................................................................ 16

    B.  Balance of Equities and Public Interest ............................................................. 18

III.  Plaintiffs have adequately stated a claim for relief on all counts. ........................... 18

    A.  Plaintiffs have stated a denominational discrimination claim (Count IV) ........ 18

    B.  Plaintiffs have stated expressive association and assembly claims
        (Counts V and VI). ............................................................................................. 19

    C.  Plaintiffs have adequately stated a claim of unconstitutional vagueness
        (Count VII). ........................................................................................................ 20

CONCLUSION .................................................................................................................. 20

CERTIFICATE OF SERVICE .......................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative v. Elenis,*
    600 U.S. 570 (2023)................................................................................ 14-15

*Aparicio v. Christian Union, Inc.,*
    No. 18-cv-592, 2019 WL 1437618 (S.D.N.Y. Mar. 29, 2019)............................ 4-5

*Axson-Flynn v. Johnson,*
    356 F.3d 1277 (10th Cir. 2004) ...............................................................12

*Ballard v. Bank of Am., N.A.,*
    734 F.3d 308 (4th Cir. 2013) ...................................................................18

*Bear Creek Bible Church v. EEOC,*
    571 F. Supp. 3d 571 (N.D. Tex. 2021) ....................................................19

*Bell v. Presbyterian Church (U.S.A.),*
    126 F.3d 328 (4th Cir. 1997) .....................................................................7

*Billard v. Charlotte Catholic High Sch.,*
    101 F.4th 316 (4th Cir. 2024) ....................................................................6

*Bostock v. Clayton County,*
    590 U.S. 644 (2020)................................................................................14

*Boy Scouts of Am. v. Dale,*
    530 U.S. 640 (2000)...........................................................................15, 19

*Boy Scouts of Am. v. Wyman,*
    335 F.3d 80 (2d Cir. 2003)........................................................................19

*Bryce v. Episcopal Church,*
    289 F.3d 648 (10th Cir. 2002) ................................................................5, 6

*Burwell v. Hobby Lobby Stores, Inc.,*
    573 U.S. 682 (2014)................................................................................14

*Butler v. St. Stanislaus Kostka Catholic Acad.,*
    609 F. Supp. 3d 184 (E.D.N.Y. 2022) .......................................................4

*Carson v. Makin,*
    596 U.S. 767 (2022).................................................................................8

*Centro Tepeyac v. Montgomery County*,
    722 F.3d 184 (4th Cir. 2013) ................................................................16

*Colorado Christian Univ. v. Weaver*,
    534 F.3d 1245 (10th Cir. 2008) ...........................................................19

*Corp. of Presiding Bishop v. Amos*,
    483 U.S. 327 (1987).................................................................... 7, 17-18

*Darren Patterson Christian Acad. v. Roy*,
    699 F. Supp. 3d 1163 (D. Colo. 2023)....................................................4

*Davis v. Baltimore Hebrew Congregation*,
    985 F. Supp. 2d 701 (D. Md. 2013)................................................... 6-7

*Doe v. Catholic Relief Servs.*,
    300 A.3d 116 (Md. 2023) ...........................................................6, 8, 20

*Edgar v. Haines*,
    2 F.4th 298 (4th Cir. 2021) .................................................................18

*Fellowship of Christian Athletes v. San Jose Unified Sch.*
    *Dist. Bd. of Educ.*,
    82 F.4th 664 (9th Cir. 2023) ..........................................................12, 13

*Fulton v. City of Philadelphia*,
    593 U.S. 522 (2021)........................................................... *passim*

*Giovani Carandola, Ltd. v. Bason*,
    303 F.3d 507 (4th Cir. 2002) ...............................................................18

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
    565 U.S. 171 (2012)..............................................................................19

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995)..............................................................................15

*Kedroff v. St. Nicholas Cathedral*,
    344 U.S. 94 (1952)..................................................................................7

*Kidwell v. Transp. Commc'n Int'l Union*,
    946 F.2d 283 (4th Cir. 1991) ...............................................................19

*King v. Rubenstein*,
    825 F.3d 206 (4th Cir. 2016) ...............................................................18

*Larson v. Valente*,
    456 U.S. 228 (1982)..............................................................................19

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
   2 F.4th 330 (4th Cir. 2021) ......................................................................18

*Legend Night Club v. Miller*,
   637 F.3d 291 (4th Cir. 2011) ...........................................................16, 17

*Manning v. Caldwell*,
   930 F.3d 264 (4th Cir. 2019) ...................................................................20

*Miranda v. Garland*,
   34 F.4th 338 (4th Cir. 2022) ....................................................................18

*Nader 2000 Primary Comm., Inc. v. Hechler*,
   112 F. Supp. 2d 575 (S.D.W.V. 2000)......................................................17

*Nken v. Holder*,
   556 U.S. 418 (2009)..................................................................................18

*NLRB v. Catholic Bishop of Chi.*,
   440 U.S. 490 (1979)...........................................................................8-9, 10

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
   591 U.S. 732 (2020)...........................................................................5, 7, 8

*Our Lady's Inn v. City of St. Louis*,
   349 F. Supp. 3d 805 (E.D. Mo. 2018).......................................................19

*Poindexter v. Strach*,
   324 F. Supp. 3d 625 (E.D.N.C. 2018).......................................................17

*Priests for Life v. HHS*,
   7 F. Supp. 3d 88 (D.D.C. 2013) ...............................................................19

*Ram v. Lal*,
   906 F. Supp. 2d 59 (E.D.N.Y. 2012) .........................................................5

*Rayburn v. Gen. Conf. of Seventh-day Adventists*,
   772 F.2d 1164 (4th Cir. 1985) ......................................................5, 8, 14

*Redeemed Christian Church of God v. Prince George's County*,
   17 F.4th 497 (4th Cir. 2021) ....................................................................13

*Roberts v. U.S. Jaycees*,
   468 U.S 609 (1984)...................................................................................19

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
   592 U.S. 14 (2020)....................................................................................16

*Serbian E. Orthodox Diocese v. Milivojevich*,
    426 U.S. 696 (1976)............................................................................. 5-6, 7

*Union Gospel Mission of Yakima v. Ferguson*,
    No. 1:23-cv-3027, 2024 WL 4660918
    (E.D. Wash. Nov. 1, 2024)................................................ 11-12, 15, 16

*Tandon v. Newsom*,
    593 U.S. 61 (2021)...........................................................................10, 11

*United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*,
    389 U.S. 217 (1967).............................................................................20

*United States v. Seeger*,
    380 U.S. 163 (1965)..............................................................................7

*We The Patriots USA, Inc. v. Hochul*,
    17 F.4th 266 (2d Cir. 2021) ...............................................................12

*WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*,
    553 F.3d 292 (4th Cir. 2009) ..............................................................16

**Statutes**

Md. Code, State Gov't § 20-602...............................................................6

Md. Code, State Gov't § 20-603...............................................................6

**Other Authorities**

Michael W. McConnell, *The Origins and Historical Understanding of Free
    Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990).............................5

## INTRODUCTION

It is difficult to say whether Defendants' opening brief is more remarkable for what it contends or what it concedes. But as to both Defendants' motion to dismiss and Plaintiffs' motion for a preliminary injunction, Defendants' brief misses the mark. First, Defendants contend that Plaintiffs' church autonomy claim should be dismissed and the preliminary injunction denied because MFEPA's protections are broader than the First Amendment's ministerial exception. But no court has ever held that church autonomy protects only ministerial hiring. Indeed, Defendants' leading case—*Our Lady of Guadalupe*—says the opposite. And Plaintiffs are unaware of any case suggesting a church could be forced to hire non-believers to help carry out its work consistent with church autonomy. This Court should enjoin Defendants' effort to make this case the first.

Second, as to Plaintiffs' religious entanglement claim, Defendants concede MFEPA lets the Court probe Plaintiffs' internal affairs to second-guess which employees need to be observant Adventists. They also concede that the *Doe* inquiry would be unconstitutionally entangling if conducted with respect to ministerial employees. But investigating a church's affairs to ascertain its core missions and which employees are critical to "directly" carrying them out has the same entangling effect regardless of which employees are implicated. Plaintiffs should not be left to fear that making religious decisions about how best to carry out their own missions could run afoul of what a secular judge or jury might think.

Third, Defendants concede MFEPA includes three secular exceptions that exempt 80% of Maryland employers, and a religious exception that covers some religious organizations but not Plaintiffs. That triggers strict scrutiny multiple times over. And Defendants do not even come close to satisfying that demanding standard. Indeed, Defendants haven't identified a single problem in need of solving. Nor could they, considering there is nothing invidious about religious

organizations expecting their employees to support and uphold their religious missions. Indeed, Title VII of the federal employment nondiscrimination law, the pre-*Doe* Maryland law, and the vast majority of analogous state laws have all protected such religious hiring practices by religious organizations for decades. And a federal court in Washington just recently ruled that a *Doe*-like attempt to narrow such protections was unconstitutional. This Court should follow suit.

Defendants further bemoan that religious ministries might "assert" religious claims to engage in race or national-origin discrimination. But protecting Plaintiffs' right to engage in mission-aligned hiring doesn't mean Plaintiffs' employees have no recourse against invidious discrimination. Outside the context of ensuring alignment with Plaintiffs' faith and mission, Plaintiffs' employees remain protected by MFEPA. Besides, even after *Doe*, Maryland exempts all "ministerial" employees and all those who "directly" advance a religious organization's "core" mission and are terminated for religious reasons. Thus, MFEPA's religious exemption already applies to most religious organizations' employees. Yet there is no evidence that religious organizations have exploited these protections to invidious ends.

Everything Plaintiffs do serves one purpose: to help others understand the Bible and to find freedom, healing, and hope in Jesus. Thus, unlike Adventist healthcare ministries, which have broader missions and hire without regard to religion for all but the most senior positions,[1] Plaintiffs expect all their employees to fully embrace and promote their religious beliefs and practices. Forcing Plaintiffs to hire a non-Adventist Christian, a Muslim, Jew, or Hindu, or even an atheist to serve the Church as an employee in its world headquarters would inherently undermine

---

[1]    In the United States, the Seventh-day Adventist Church has five different healthcare systems, all of which hire non-Adventists. In Maryland, Adventist Healthcare, Inc. hires non-Adventists for all positions except a limited number of its most senior positions required by its bylaws. It is not a party to this action and is not seeking an exemption for its long-standing hiring practices.

Plaintiffs' entire reason for being. Such non-Adventist employees would lack capacity to pursue, as is expected, every aspect of the Church's work with an ennobling shared faith. Moreover, Plaintiffs would have to provide religious accommodations for any non-Adventist employee's distinct faith needs to remain compliant with MFEPA. Upholding *Doe* would also mean that secular ideological organizations could restrict hiring to individuals who embrace their missions, even while religious ones could not—a perverse result that raises serious constitutional concerns.

Although Plaintiffs intend to continue their religious hiring practices, that is only because they believe every employee is mission critical. Still, they fear that secular courts will second-guess them, which inevitably puts unconstitutional pressure on their internal religious decision-making, diverting energy and resources from their religious mission to anticipate and avert potential litigation. This looming threat confirms why Plaintiffs need a preliminary injunction now.

## ARGUMENT

Defendants ask this Court to deny Plaintiffs' motion and dismiss the Complaint. On the preliminary injunction, however, Plaintiffs have shown a clear likelihood of success on Counts I, II, and III, and easily satisfy the remaining factors. As for the motion to dismiss, Defendants must prove that Plaintiffs' claims aren't even "plausible." Resp. 10. But when another court has just entered an injunction in a nearly identical case, there is no question Plaintiffs' claims are plausible. *Infra* 11-12. This Court should thus enter an injunction and deny the motion to dismiss.

## I. Plaintiffs are likely to succeed on the merits.

### A. MFEPA violates church autonomy (Count I).

The church autonomy doctrine protects the freedom of religious organizations to make decisions regarding church government as well as faith and doctrine, which necessarily includes the right to make religious hiring decisions for all employees. Br. 10-11. In response, Defendants

seek to narrow this doctrine, arguing that, "[i]n the employment context, the church autonomy doctrine takes the form of the 'ministerial exception.'" Resp. 11. This is dead wrong. "[N]o binding authority has ever said that the ministerial exception eclipses this doctrine in employment-discrimination cases." *Butler v. St. Stanislaus Kostka Catholic Acad.*, 609 F. Supp. 3d 184, 204 (E.D.N.Y. 2022). To the contrary, multiple courts have applied church autonomy to protect religious hiring for non-ministerial employees. *See* Br. 12-13 (citing cases).

Defendants try to distinguish some of these cases as addressing "entanglement" (*Curay-Cramer*) or "foreclos[ing] judicial inquiry" into religious matters (*Butler*; *Garrick*). Resp. 13 n.2. But those are literally descriptions of the "church-autonomy principle," which "arises not only from the recognition that secular courts have limited *business* managing religious institutions, but also that courts have limited *aptitude* for such management." *Butler*, 609 F. Supp. 3d at 199. Others they attempt to distinguish as not actually addressing church autonomy (*Darren Patterson*) or as only addressing ministerial employees (*Aparicio*). Resp. 13 n.2. But those are mischaracterizations. *Darren Patterson* recognized that the First Amendment "forbids" the state from interfering with religious institutions' decisions to "hire only coreligionists, and to continue internal policies … rooted in religious beliefs," even when the religious institution is receiving government funding. *Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163, 1185 (D. Colo. 2023). All the more so here, where no funding is involved. And although *Aparicio* technically involved a "leader," he was "not a 'minister'" and "not" subject to "the ministerial exception." *Aparicio v. Christian Union, Inc.*, No. 18-cv-592, 2019 WL 1437618, at *7 (S.D.N.Y. Mar. 29, 2019). Still, church autonomy barred application of "Title VII's anti-retaliation provision" because "the basis for the alleged retaliation" was the "employee's objections to his … employer's

religious discrimination." *Id.* at *9. In short, Defendants not only fail to distinguish Plaintiffs' cases, but fail to cite a case rejecting church-autonomy, as they ask the Court to do entirely here.

Defendants further attempt to downplay the church autonomy doctrine by challenging *Bryce*, arguing that it "might well have come within the ministerial exception." Resp. 13-14. But this argument fails. First, *Bryce* is in no way a ministerial exception case. The court expressly held that "inquiry" into whether Bryce was a minister was "unnecessary … because Bryce's claims [were] based solely on communications that are protected … under the broader church autonomy doctrine." *Bryce v. Episcopal Church*, 289 F.3d 648, 658 n.2 (10th Cir. 2002). And the other *Bryce* plaintiff's claims were likewise barred by church autonomy even though that plaintiff was "not associated with [the church] in any way." *Id.* at 651, 658.

Second, Plaintiffs' church autonomy argument does not rely on *Bryce* alone. The Supreme Court itself recently confirmed that the ministerial exception is but one "component" of the broader church autonomy doctrine. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020). As the Court there pointed out, the "constitutional foundation" of the ministerial exception is this "general principle of church autonomy." *Id.* at 747. Indeed, the Court even noted that its earlier cases developing the foundations for the ministerial exception "drew on this broad principle [of church autonomy], and none was exclusively concerned with the selection or supervision of clergy." *Id.* at 747. Indeed, this doctrine protects Plaintiffs' right to make "[e]cclesiastical decisions … on matters of discipline, faith, [and] internal organization," *Rayburn v. Gen. Conf. of Seventh-day Adventists*, 772 F.2d 1164, 1167 (4th Cir. 1985), to define "membership," Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1464 (1990); *see also Ram v. Lal*, 906 F. Supp. 2d 59, 70 (E.D.N.Y. 2012) (gathering cases), and to govern "all the individual members, congregations, and officers within the general

association," *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 711 (1976). These rights are "unquestioned." *Id*. Plaintiffs, therefore, are *a fortiori* free to determine which members they will pay to help carry out functions of the Church—regardless of the nature of the work. If the First Amendment protects Plaintiffs' ability to discipline a member by withholding church employment, it would make no sense to insist they must consider nonmembers as a replacement.[2]

Defendants next raise exaggerated concerns about insincere religious claims, fretting that churches will be "above the law" and "assert" false beliefs to engage in race, sex, or national-origin discrimination. Resp. 2, 12-14, 16. But MFEPA protected Plaintiffs' co-religionist hiring policies *for nearly sixty years* and the sky never fell. Similarly, Title VII, thirty-one states, and the District of Columbia all protect mission-aligned hiring. Br. 25-26 & n.3. Moreover, Maryland entirely exempts 80% of state employers under its small business exception. And the ministerial exception "categorically prohibit[s]" employment discrimination claims by all ministerial employees. *Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316, 325 (4th Cir. 2024), while *Doe* still bars claims by employees who "directly further" a religious organization's "core mission[s]," *Doe v. Catholic Relief Servs.*, 300 A.3d 116, 132 (Md. 2023). With such protections already available to religious organizations, there is no reason to think that protecting religious hiring for Plaintiffs' remaining employees creates some new risk.

Finally, "[t]he church autonomy doctrine is not without limits." *Bryce*, 289 F.3d at 657. It "does not apply to purely secular decisions, even when made by churches." *Id*. Rather, decisions affecting non-ministerial employees are protected only if "rooted in religious belief." *Id*.; *see, e.g.*, *Davis v. Baltimore Hebrew Congregation*, 985 F. Supp. 2d 701 (D. Md. 2013) (addressing

---

[2]  And indeed, hiring nonmembers would trigger other provisions of MFEPA—including the requirement that Plaintiffs' world headquarters accommodate the religious exercise of employees of other faiths. *See* Md. Code, State Gov't §§ 20-602, 20-603.

manager's racial discrimination claims where manager had non-ministerial role and religious organization asserted non-religious reasons for firing). Moreover, that belief must be sincere. *See Our Lady*, 591 U.S. at 751; *United States v. Seeger*, 380 U.S. 163, 185 (1965). The right to engage in mission-aligned hiring is thus *not* "an absolute bar to employment discrimination claims." Resp. 12. But here there is no dispute that Plaintiffs sincerely believe "God's work is to be jealously safeguarded" and that Church employees must model an "exemplary commitment to the Lord and the teaching of His Church." Compl. ¶¶ 26, 27. Therefore, "courts must defer" to such a decision, *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 330-31 (4th Cir. 1997) (quoting *Milivojevich*, 426 U.S. at 713), respecting the "spirit of freedom" that church autonomy preserves for "religious organizations." *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952). It would be a "significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious." *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 336 (1987).[3]

**B.  MFEPA excessively entangles the State in religious decision-making (Count II).**

The First Amendment forbids excessive government entanglement in matters of religious faith or doctrine. Br. 14-15. But the Maryland Supreme Court has interpreted MFEPA's religious exception to require courts to make an independent, "fact-intensive inquiry" without any deference to the religious organization's sincere religious beliefs. Br. 8. Defendants claim this analysis isn't entangling because "MFEPA asks courts to make garden-variety determinations of fact." Resp. 18. But it is hard to imagine anything *less* "garden-variety" than a court attempting to identify a

---

[3]    Protecting mission-aligned hiring also does not mean there is "little need," Resp. 13, for the ministerial exception. While the ministerial exception forecloses all employment claims brought by "ministers," the mission-aligned hiring (sometimes called the "coreligionist exception") protects only those decisions rooted in sincere religious belief. Br. 12.

religious organization's "core mission(s)." Indeed, *Doe* tells courts to rummage through a religious organization's internal affairs and assess the "totality of the circumstances that shed light on an entity's core mission(s)." *Doe*, 300 A.3d at 137 & n.20. This includes, among other things, assessing the church's own description of its mission(s), the services it provides, who it serves, and how it spends its money. *Id*. Were a former employee to sue the Church under MFEPA, for example, *Doe* would require a secular court to adjudicate between competing assertions—from the Church and from the former employee—regarding what constitutes the Church's "mission(s)" and who "directly" furthers those missions. *Id.* This is exactly the type of "scrutinizing" of a religious entity that "raise[s] serious concerns about state entanglement with religion." *Carson v. Makin*, 596 U.S. 767, 787 (2022). And this is *particularly* problematic when applied to "the church itself." *Rayburn*, 772 F.2d at 1170.

This intrusive, independent inquiry also distinguishes *Doe* from *Our Lady*. The Court in *Our Lady* did not second-guess the religious school's assertion of its core mission; instead, it took the school's sincere religious beliefs and assertions about its mission as true. *Our Lady*, 591 U.S. at 755-57. As the Court itself cautioned, courts must give great weight to a "religious institution's explanation" of its own mission and how its employees further that mission. *Id.* at 757; *id.* at 763 (Thomas, J. concurring) (explaining why "deference is necessary" in this context). *See also Rayburn*, 772 F.2d at 1169 (deferring to church regarding what constitutes its "spiritual mission").

*Catholic Bishop* also makes this clear. There, the NLRB sought jurisdiction over religious schools' conditions of employment for "lay teachers." *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 493 (1979).[4] Like Defendants here, the NLRB "argue[d] that it [could] avoid excessive

---

[4]    *Catholic Bishop*'s constitutional analysis is no less instructive because it arose in the context of constitutional avoidance. *Contra* Resp. 17-18. As the Court explained, it saw "no escape" from

entanglement since it [would] resolve only factual issues." *Id.* at 502; *see* Resp. 17. But the Court rejected this argument, explaining that "[g]ood intentions" cannot "avoid entanglement with the religious mission of the school." *Catholic Bishop*, 440 U.S. at 502. Instead, the Court found that resolving disputes regarding unionization would "necessarily involve inquiry into the good faith position asserted by the clergy-administrators and its relationship to the school's religious mission." *Id.* at 502. The "very process of inquiry" was unconstitutionally entangling. *Id.*

But this Court need not rely on the Supreme Court alone. The Fourth Circuit has a three-part test for analyzing excessive entanglement—and all three factors point to a constitutional violation. Br. 16-20. First, regarding "character and purpose[ ]," Defendants apparently concede that the General Conference is sufficiently religious, but suggest ARM is "merely" the Church's insurance and risk management provider. Resp. 15. But Defendants cannot dispute that ARM is part of the Church and never question the sincerity of Plaintiffs' religious determination that ARM is so critical to the Church's mission that all its employees must be mission-aligned.

Second, Defendants don't dispute that the burdens imposed by noncompliance with MFEPA are the same as those in *Rayburn*—they just claim that the "context" is different. Resp. 16. But nothing Defendants cite supports this narrowing of *Rayburn*'s test when the acts of intrusion are admittedly identical. At bottom, all Defendants can do is suggest that civil investigations and monetary fines for following sincere religious beliefs are "an ordinary part of any large organization's existence." Resp. 16. But the Supreme Court has never endorsed a "too big to be religious" test, and Defendants' claim is particularly absurd here—when considering restrictions on the religious exercise of a minority faith community.

---

the "conflict[ ]" caused by the NLRB's exercise of jurisdiction and "the consequent serious First Amendment questions that would follow." 440 U.S. at 504.

*Third*, regarding the "resulting relationship" between government and "religious authority," Defendants have no response to *Amos* or *Duquesne University*—nor do they dispute that *Doe* requires courts to "sift through all aspects of Plaintiffs' ministry." Br. 19-20. Instead, Defendants (again) suggest that *Rayburn*'s analysis is limited to ministerial employees. Resp. 16. Nothing in *Rayburn* supports this narrow reading. To the contrary, *Catholic Bishop* held that inquiring into unfair labor practices regarding "lay teachers" at a religious school would "[*i*]*nevitably*" "implicate sensitive issues that open the door to conflict" between church and state. 440 U.S. at 498, 503. If that's true for lay teachers, it is true here too.

### C. MFEPA violates Plaintiffs' Free Exercise rights (Count III).

#### 1. MFEPA's anti-discrimination requirement is not generally applicable.

Defendants don't dispute that MFEPA burdens Plaintiffs' religious exercise. *See* Br. 21. Instead, they argue only that MFEPA's anti-discrimination requirement is generally applicable. Resp. 18-22. But their own concessions confirm the opposite.

*Categorical exceptions*. Defendants admit that MFEPA has categorical exceptions for secular reasons—including an exception for employers with fewer than 15 employees. Resp. 2, 19 (listing conceded exceptions). But Defendants claim these exceptions don't trigger strict scrutiny because three are available to "religious or secular" employers and one is available to only "religious schools." Resp. 19. But this misunderstands general applicability. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). Thus, "[c]omparability is concerned with the risks various activities pose." *Id*.; *see also Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021) ("A law also lacks general applicability

if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way.").

Here, the government interest underlying MFEPA is "anti-discrimination." Resp. 2. And the conceded exceptions undermine that interest by allowing exempt employers to engage in otherwise-unlawful employment discrimination for *secular reasons*. *Id.* at 2, 19; Br. 22. MFEPA is therefore not generally applicable because Maryland is willing to tolerate secular reasons for an exception (*e.g.*, because the employer is small or a private club, Resp. 2, 19), but not religious reasons (*e.g.*, because the employer requires all employees to exemplify its faith). Br. 22-23.

This analysis doesn't change just because some religious employers might be covered by one of MFEPA's secular exceptions. *Contra* Resp. 19-20. Instead, the relevant distinction is between *reasons for an exception* that are secular and *reasons for an exception* that are religious. The small-employer exception, for example, is a secular exception even if some small employers happen to be religious because the reason for the exception (presumably, to spare small employers the costs of compliance) are secular in nature. Put another way, the First Amendment requires a *religious reason* for an exception from a law be treated at least as well as *any secular reason*. *See Tandon*, 593 U.S. at 62 (assessing whether secular and religious *reasons* for an exception "presented similar risks" to the government's interest); *Fulton*, 593 U.S. at 610 (Alito, J., concurring in judgment).

This is exactly how Judge Dimke, just last month, analyzed an analogous Washington state law under *Tandon*. *Union Gospel Mission of Yakima v. Ferguson*, No. 1:23-cv-3027, 2024 WL 4660918, at *4 (E.D. Wash. Nov. 1, 2024). Confronting an identical argument about a small-employer secular exception, the court "reject[ed] Defendants' narrowing of *Tandon*." *Id.* Instead, it confirmed "[f]or purposes of examining whether a law is neutral or generally applicable," that "it is insufficient to examine how the law treats, for example, a religious employer with five

employees and a secular employer with five employees." *Id.* Because a secular exception for small employers undermined the law's anti-discrimination interest in a way comparable to the religious exception plaintiffs sought, the court held that law was not generally applicable. *Id.* Identical analysis applies here.

**Individualized exceptions.** "A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by creating a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 523. MFEPA's bona fide occupational qualification (BFOQ) exception gives Maryland authority to determine on a case-by-case basis whether an employer's consideration of otherwise-protected characteristics is "reasonably necessary" to the employer's "normal operation." Br. 23. Defendants respond that the BFOQ exception does not give the government *enough* discretion. Resp. 21. But the cases Defendants cite undermine this claim. *FCA* rejected this argument: "[t]he [defendant's] assertion that *Fulton* was only concerned with 'unfettered' discretion, is overly narrow. Properly interpreted, *Fulton* counsels that the mere existence of a discretionary mechanism to grant exemptions can be sufficient to render a policy not generally applicable." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 687-88 (9th Cir. 2023) (en banc). So too, *We The Patriots* recognized that discretion need not be absolute to trigger strict scrutiny—instead, discretion cabined by a "good cause" requirement "lent itself to individualized government assessment of the reasons for the relevant conduct," and would trigger strict scrutiny. *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 288 (2d Cir. 2021). And *Axson-Flynn*, decided before *Fulton* strengthened this requirement, also recognized that "case-by-case determinations" can trigger strict scrutiny. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1298 (10th Cir. 2004). These cases confirm that "[a] law is not generally

applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533 (cleaned up).

The BFOQ exception does exactly that. *See* Resp. 2. Deciding, for example, whether hiring only younger employees is "reasonably necessary" to an employer's "normal operation" is—almost by definition—going to be a case-by-case assessment. There are, of course, some caselaw limitations on the meaning of "reasonable," but discretion need not be "unfettered" to trigger strict scrutiny. *Fulton* itself recognized that discretion cabined by a "good cause" standard can still trigger strict scrutiny. 593 U.S. at 533 (citing *Smith* and *Sherbert*); *see also FCA*, 82 F.4th at 687 (requiring "unfettered" discretion "is overly narrow"). Yet courts frequently provide guidance on what qualifies as "good cause."

Nor can Defendants hide behind the claim that the BFOQ exception is supposedly "self-executing." Resp. 21. Even if an employer could claim the exception without asking permission first, Defendants retain authority to impose government oversight on the backend. Just because the government may move its discretion from the front end to the back end doesn't change the fact that applying the BFOQ exception requires a case-by-case analysis.

### 2. MFEPA's prohibition on mission-aligned hiring cannot satisfy strict scrutiny.

Defendants bear the burden to satisfy strict scrutiny. Br. 23-26; *Redeemed Christian Church of God v. Prince George's County*, 17 F.4th 497, 510 (4th Cir. 2021). They cannot do so here.

**Compelling Interest.** "A 'compelling interest' is not a general interest but must be particular to the specific case; namely, the interest requires the infringement of a particular right in this case due to an interest of the highest order." *Redeemed*, 17 F.4th at 510. In other words, the government cannot point to an abstract "compelling" interest; it must explain why denying *Plaintiffs* an exception *in this case* is so critical. Br. 24.

Here, however, Defendants don't even allege they have a compelling interest in denying Plaintiffs a religious exception. Instead, they simply claim a high-level "interest in eliminating discrimination in employment" generally. Resp. 31. But "enforcing … non-discrimination policies generally" is never sufficient. *Fulton*, 593 U.S. at 541. Defendants must prove they have a compelling interest in "denying an exception" from MFEPA for these Plaintiffs. *Id*. They don't even attempt to make this argument and thus fail the compelling interest prong of strict scrutiny as a matter of law. Moreover, MFEPA's numerous secular exemptions further undermine Defendants' argument that their asserted interest is compelling. Br. 24.

Even the cases Defendants cite for their broader proposition that anti-discrimination is alone compelling don't support their claim. *Rayburn* concluded that the government's anti-discrimination interest could *not* overcome the church's free exercise right: "Here that balance weighs in favor of free exercise of religion." *Rayburn*, 772 F.2d at 1168. And the language quoted from *Hobby Lobby*, Resp. 31, involved a hypothetical concern raised by the dissent that the court's decision would permit for-profit companies to discriminate based on race—the Court was certainly not staking out a position on whether churches could engage in mission-aligned hiring. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733 (2014). Finally, the Sixth Circuit's decision in *Harris Funeral Homes* is hardly worth citing when the Supreme Court's subsequent ruling recognized the critical importance of "preserving the promise of the free exercise of religion" and pointed to Title VII's religious exemption (which covers mission-aligned hiring) as important to protecting this right. *Bostock v. Clayton County*, 590 U.S. 644, 681-82 (2020). Not only do Defendants' own cases betray them, but *Fulton*, *303 Creative*, *Hurley*, and *Dale* hold that protecting First Amendment rights frequently outweighs anti-discrimination interests. *See 303 Creative v. Elenis*,

600 U.S. 570, 591, 603 (2023); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 561, 581 (1995); *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 646, 650 (2000).

***Least Restrictive Means.*** Should this Court want an *even easier* path to resolving strict scrutiny, however, it can turn directly to the least restrictive means analysis: Defendants offer *no* argument on this point despite bearing the burden of proof. What is more, as Plaintiffs have already explained, Defendants can't hope to show that denying Plaintiffs a religious exception is the least restrictive way of advancing their alleged interest in anti-discrimination. First, MFEPA's prohibition on discrimination is riddled with secular exceptions (a fact Defendants don't dispute). Br. 24-25; Resp. 2. When 80% of employers are exempt from the law's requirements, it is impossible to argue that denying Plaintiffs a narrow religious exception is the least restrictive means of eliminating discrimination. Br. 24-25; *Union Gospel Mission,* 2024 WL 4660918, at *4 (WLAD's under-inclusivity causes it to fail strict scrutiny). Indeed, it is hard to imagine how Defendants could ever justify denying Plaintiffs a religious exception when they admit MFEPA permits religious *schools* to engage in mission-aligned hiring regardless of the position. Resp. 2.

Worse still, Maryland's own past practice—and the ongoing practice of the federal government and most states—confirms that Maryland could advance its anti-discrimination interest without infringing on Plaintiffs' sincere religious exercise. Br. 25; Resp. 4. When past practice, and evidence from most other jurisdictions, confirms that Maryland can and has advanced its interest without infringing on religious exercise, the least restrictive means analysis is fatal. Br. 25-26.

Defendants also fail to show that denying Plaintiffs an exception would solve an "actual problem." Br. 26. First, Defendants never explain why allowing a church to limit its hiring to individuals who will support and uphold its beliefs is the type of invidious discrimination MFEPA was designed to prohibit. Second, despite decades of experience and dozens of states where this is

15

the law today, Defendants don't point to any evidence that accommodating a religious organization's mission-aligned hiring has caused problems. Defendants' alleged "horribles" have never paraded. *Supra* 6.

## II. The remaining preliminary injunction factors are easily satisfied.

### A.  Irreparable Harm

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020); *see also Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013) (en banc) (same). Because Plaintiffs have shown a likelihood of success on Counts I through III, it is "well established" that this loss of First Amendment rights alone satisfies this requirement. *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011); *see e.g.*, *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) ("[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success[.]"). What is more, gutting Plaintiffs' church-autonomy and free-exercise rights is exactly "the sort [of injury] that could not be remedied absent an injunction." *Legend Night Club*, 637 F.3d at 302. And interfering with Plaintiffs' "ability to hire staff consistent with its religious beliefs" is "an enduring harm that will irreparably risk [Plaintiffs'] continued existence." *Union Gospel Mission*, 2024 WL 4660918, at *5 (alteration in original) (quoting *FCA*, 82 F.4th at 695). As the Fourth Circuit has confirmed, the "direct penalization … of First Amendment rights" is plainly irreparable. *Legend Night Club*, 637 F.3d at 302.

Defendants, however, argue that the harm here is not sufficiently "imminent" and suggest that Plaintiffs didn't seek judicial relief quickly enough. Resp. 33-34. But Defendants misunderstand Plaintiffs' irreparable harm: As *Diocese of Brooklyn* confirmed, irreparable harm does not stem

solely from future enforcement of a law; it is the loss of First Amendment rights *itself* that is irreparable. This harm is both "imminent" (it is ongoing) and "irreparable" (it cannot later be remedied). *See Legend Night Club*, 637 F.3d at 302 ("monetary damages are inadequate"). As to what has happened since *Doe*, Defendants suggest the lack of immediate enforcement casts doubt on Plaintiffs' irreparable harm. *See* Resp. 34 (suggesting Plaintiffs haven't alleged "*any* harm" since *Doe*). But, again, Defendants misunderstand Plaintiffs' harm—their loss of First Amendment rights. Defendants also ignore the fact that non-moribund statutes come with a presumption of enforcement absent the government disclaiming intent to enforce the law. Br. 29-30.

Further, to the extent Defendants are suggesting Plaintiffs should have brought this lawsuit sooner, Plaintiffs weren't merely sitting on their hands once the *Doe* decision came out. After *Doe*, Plaintiffs first participated in legislative efforts both fighting efforts to expand *Doe* and supporting efforts to protect religious exercise after *Doe*. These efforts ended earlier this year. And, after this, Plaintiffs worked diligently to assess *Doe*'s impact on their hiring practices and determine whether a lawsuit was in the Church's best interest. But, regardless, this purported delay is hardly dispositive when First Amendment rights are on the line. *See Poindexter v. Strach*, 324 F. Supp. 3d 625, 635 (E.D.N.C. 2018); *Nader 2000 Primary Comm., Inc. v. Hechler*, 112 F. Supp. 2d 575, 579 n.2 (S.D.W.V. 2000) (Plaintiffs "should not have to sacrifice First Amendment rights because the State interposed unconstitutional requirements … even when such individuals may have failed to act with dispatch to challenge the law."). And it certainly can't be the case that failure to challenge an unconstitutional decision the moment it is published means a plaintiff can never seek preliminary relief—to so hold would incentivize filing lawsuits first and asking questions later. Nor is it relevant that Plaintiffs intend to continue pursuing their religious hiring. Resp. 34. They do so under "[f]ear of potential liability," which "might affect the way an organization carried out

what it understood to be its religious mission"—itself an irreparable harm. *Amos*, 483 U.S. at 336; *Edgar v. Haines*, 2 F.4th 298, 310 (4th Cir. 2021) ("[P]laintiffs need not show that the government action led them to stop speaking.").

## B. Balance of Equities and Public Interest

Finally, the balance of equities and public interest "merge when the Government is the opposing party." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). And "upholding constitutional rights surely serves the public interest." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002); *accord Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021). Moreover, the government surely isn't harmed by an injunction that temporarily halts enforcement of a new interpretation of MFEPA with respect to a narrow class of employees. Defendants claim the State "has a strong interest in ensuring equal employment opportunity for all," Resp. 35, an interest it presumably served while enforcing MFEPA for the nearly sixty years before the Maryland Supreme Court reinterpreted it just last year.

## III. Plaintiffs have adequately stated a claim for relief on all counts.

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ballard v. Bank of Am., N.A.*, 734 F.3d 308, 310 (4th Cir. 2013); *see King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016). As explained above, Plaintiffs have shown a likelihood of success on Counts I, II, and III and therefore certainly clear the lower plausibility threshold. And, as to the remaining counts, they also easily satisfy the 12(b)(6) standard.

## A. Plaintiffs have stated a denominational discrimination claim (Count IV).

MFEPA, as interpreted by *Doe*, distinguishes between faith groups whose beliefs require employees to share their faith and those whose do not. Compl. ¶¶ 117-19. It does so by stripping

protection from religious communities that only hire individuals who share their faith and are aligned with their religious mission, while affording protection to faith groups without a mission-aligned hiring practice. *Id.* This is the type of "explicit and deliberate distinctions between different religious organizations" the Supreme Court has disallowed. *Larson v. Valente,* 456 U.S. 228, 246 n.23 (1982); *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1259 (10th Cir. 2008) (same).

**B.  Plaintiffs have stated expressive association and assembly claims (Counts V and VI).**

Plaintiffs' hiring practices are an expression of their religious beliefs. Compl. ¶ 126. And as the Fourth Circuit has explained, "[t]here can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire." *Kidwell v. Transp. Commc'n Int'l Union*, 946 F.2d 283, 301 (4th Cir. 1991) (quoting *Roberts v. U.S. Jaycees*, 468 U.S 609, 623 (1984)). And, contrary to what Defendants claim, there is no employment exception from the freedom of association. *See* Resp. 26. Numerous courts have held that freedom of association applies to employment claims.[5]

Under *Dale*, courts look at whether the organization "engage[s] in some form of expression" and whether the forced association would "significantly affect [its] ability to advocate" for its viewpoints. 530 U.S. at 648, 650. Here, Plaintiffs have alleged sufficient facts to support both requirements. First, Plaintiffs express their religious beliefs by only hiring those who follow their religious conduct standards. Compl. ¶¶ 126-27; *see also Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 200 (2012) (Alito, J., joined by Kagan, J., concurring) ("Religious groups are the archetype of associations formed for expressive purposes."). And,

---

[5]  *E.g.*, *Boy Scouts of Am. v. Wyman*, 335 F.3d 80, 88, 91 (2d Cir. 2003) (Scouts may "under any reading of *Dale*" exclude "gay activists" from "employment positions" involving "leadership"); *Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571, 614-16 (N.D. Tex. 2021); *Our Lady's Inn v. City of St. Louis*, 349 F. Supp. 3d 805, 822 (E.D. Mo. 2018); *Priests for Life v. HHS*, 7 F. Supp. 3d 88, 109 (D.D.C. 2013).

second, forcing Plaintiffs to hire employees who act or speak in a manner contrary to Plaintiffs' religious expression would cause irreparable harm. Compl. ¶ 129.

Likewise, MFEPA violates Plaintiffs' right of assembly by burdening Plaintiffs' ability to carry out their ministry with a mission-aligned staff. As Plaintiffs alleged, "Church members must see in church workers a fidelity to basic principles which is unequivocal." Compl. ¶ 127. And so, if Plaintiffs can't continue with mission-aligned hiring, they lose their right "to assemble peaceably" which is "among the most precious liberties safeguarded by the Bill of Rights." *See United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967).

### C. Plaintiffs have adequately stated a claim of unconstitutional vagueness (Count VII).

MFEPA, as interpreted by *Doe*, doesn't give meaningful notice to Plaintiffs regarding which employment decisions are covered by the religious exemption. Plaintiffs can't be sure which employees will be deemed those who "directly further[ ]" the Church's mission and which will be subject to MFEPA. Compl. ¶ 142; *see Doe*, 300 A.3d at 136-37. Indeed "a person of ordinary intelligence" would struggle to wade through the Maryland Supreme Court's "non-exhaustive" list of considerations to determine which religious employees are covered. *See Manning v. Caldwell*, 930 F.3d 264, 272 (4th Cir. 2019); *Doe*, 300 A.3d at 164. Defendants are also wrong in their claim that some vagueness in MFEPA should be tolerated because the "consequences of imprecision are qualitatively less severe." *See* Resp. 30 (quoting *Manning*, 930 F.3d at 272). As explained above, the consequences—intrusive investigations, civil penalties, and most importantly the loss of First Amendment freedoms—are undoubtedly severe.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Preliminary Injunction Motion and deny Defendants' Motion to Dismiss.

Dated: December 9, 2024                    Respectfully submitted,

Todd R. McFarland                          /s/ Eric Baxter
D. Md. Bar No. 28777                       Eric S. Baxter
GENERAL CONFERENCE OF                      D. Md. Bar No. 15640
SEVENTH-DAY ADVENTISTS                     Nicholas R. Reaves
12501 Old Columbia Pike                    D. Md. Bar No. 31293
Silver Spring, MD 20904                    Andrea R. Butler (pro hac vice)
Tel.: (301) 680-6000                       Kelsey Baer Flores (pro hac vice)
*mcfarlandt@gc.adventist.org*              THE BECKET FUND FOR RELIGIOUS LIBERTY
                                           1919 Pennsylvania Ave, N.W.
                                             Suite 400
                                           Washington, DC 20006
                                           Tel.: (202) 955-0095
                                           *ebaxter@becketlaw.org*

                                           *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2024, a copy of the foregoing document was served on counsel for all Defendants via this Court's CM/ECF system.

Dated: December 9, 2024                    /s/ Eric S. Baxter
                                           Eric S. Baxter