## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

GENERAL CONFERENCE OF
SEVENTH-DAY ADVENTISTS and
ADVENTIST RISK MANAGEMENT, INC.,

      Plaintiffs,

      v.

CLEVELAND L. HORTON, II,
*in his official capacity as*
*Acting Executive Director of the*
*Maryland Commission on Civil Rights*, *et al.*,

      Defendants.

Civil Action No. 24-2866-TDC

## MEMORANDUM OPINION

Plaintiffs General Conference of Seventh-day Adventists and Adventist Risk Management, Inc. have filed suit against the Acting Executive Director, General Counsel, and members of the Maryland Commission on Civil Rights, as well as the Attorney General of Maryland, challenging the religious exemption of the Maryland Fair Employment Practices Act, as interpreted by the Supreme Court of Maryland in *Doe v. Catholic Relief Services*, 300 A.3d 116 (Md. 2023). Plaintiffs have filed a Motion for a Preliminary Injunction, and Defendants have filed a Motion to Dismiss, both of which are fully briefed. On February 20, 2025, the Court held a hearing on the Motions. For the reasons set forth below, the Motion for a Preliminary Injunction will be DENIED, and the Motion to Dismiss will be GRANTED IN PART and DENIED IN PART.

**BACKGROUND**

I.    **Plaintiffs' Hiring Practices**

The Seventh-day Adventist Church ("SDAC") has 22 million members worldwide. In addition to religious beliefs commonly held with many Protestant denominations of Christianity, such as the belief in salvation through Jesus Christ, SDAC also holds specific beliefs that distinguish its faith. For example, Seventh-day Adventists observe a Saturday sabbath and consider it to be "a symbol of our redemption in Christ, a sign of our sanctification, a token of our allegiance, and a foretaste of our eternal future in God's kingdom." Compl. ¶ 21, ECF No. 1. They also believe that the body is a living temple of the Holy Spirit. Accordingly, SDAC members practice healthy living through adequate exercise and rest and abstention from unclean foods as identified in Scripture.

Plaintiff General Conference of Seventh-day Adventists ("the General Conference") is a religious nonprofit organization located in Silver Spring, Maryland that serves as the "highest ecclesiastical and administrative body" of the Seventh-day Adventist Church. *Id*. ¶ 2. Among other functions, the General Conference organizes a General Conference Session every five years, at which SDAC members elect officers and make changes to SDAC's constitution, and it adopts or modifies SDAC policies and manages SDAC business between such sessions. Plaintiff Adventist Risk Management, Inc. ("ARM") is a religious nonprofit organization that provides insurance and risk management services to SDAC's ministries, schools, and hospitals worldwide.

Plaintiffs believe that all of their employees are "representatives of [SDAC] and are responsible for sharing [SDAC's] faith with the world," and that as part of their religious exercise, their employees must "embrace [SDAC's] faith, support its religious mission, and share the faith with others." *Id*. ¶ 3. In practice, Plaintiffs' employment policies require all of their employees

2

to be baptized, tithe-paying members of SDAC in regular standing who conduct themselves in accordance with SDAC's religious beliefs, including by adhering to SDAC's teachings relating to the use of substances such as alcoholic beverages, tobacco, illegal drugs, and caffeine; marriage and sexual conduct; modest dress; and healthful living. The General Conference employee handbook states that:

> Seventh-day Adventist denominational employees are to be models in every facet of their lives. Church members must see in church workers a fidelity to basic principles which is unequivocal. Such employees will demonstrate an exemplary commitment to the Lord and the teaching of His Church.

Gen. Conference Employee Handbook at 29, Compl. Ex. B, ECF No. 1-3. ARM's employee handbook states that its employment practices "reflect religious preferences in harmony with anti-discrimination laws" and that employment considerations include "[m]embership in the Seventh-day Adventist Church in regular standing" and "[a]dherence to Bible-based teachings, lifestyle, standards, and beliefs as reflected by Seventh-day Adventist Church theology and practice." ARM Employee Handbook at 5–6, Compl. Ex. C, ECF No. 1-4. In order to ensure that all employees remain committed to SDAC's teachings, SDAC issues licenses and credentials to all full-time employees, which must be renewed regularly. A failure to practice SDAC teachings, such as engaging in remarriage without "Biblical grounds," is considered grounds for termination. Compl. ¶ 38.

Plaintiffs' religious beliefs permeate their workplaces. Each workday begins with employee worship services, which may involve interactive prayer, singing and musical worship services, and Bible study. Employees plan and lead the worship services and often open internal meetings with prayers. Plaintiffs have set a four-day work week to allow employees time to prepare for each Sabbath, which begins Friday at sundown. All organizational decisions, regardless of whether the issue relates to faith or doctrine, are guided by SDAC teachings.

## II.    MFEPA

The Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't §§ 20–601 to 20–1203 (West 2021), was first enacted in 1965 and generally prohibits employment discrimination based on protected characteristics, including religion. *See Doe v. Cath. Relief Servs.*, 300 A.3d 116, 126 & n.5 (Md. 2023). Specifically, the MFEPA provides that:

> An employer may not:  (1) fail or refuse to hire, discharge or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of:  (i) the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, military status, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment[.]

Md. Code Ann., State Gov't § 20–606(a)(1)(i).  An employer also "may not print or cause to be printed or published any notice or advertisement relating to employment by the employer . . . that indicates any preference, limitation, specification, or discrimination based on race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, disability, or military status." *Id.* § 20–606(e)(1).

Pursuant to an exemption in the statute ("the MFEPA religious exemption"), the MFEPA does not apply to a "religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion, sexual orientation, gender identity, or military status to perform work connected with the activities of the religious entity." *Id.* § 20-604(2).  Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e–17, after which the MFEPA was modeled, *see Doe*, 300 A.3d at 126, includes a comparable exemption that states that Title VII "shall not apply . . . to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." 42 U.S.C. § 2000e-1(a).  The Title VII

4

provision has been interpreted as exempting religious institutions from claims by any employees of discrimination based on religion. *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 329–30 (1987).

In 2023, in *Doe v. Catholic Relief Services*, 300 A.3d 116 (Md. 2023), the Maryland Supreme Court interpreted the MFEPA religious exemption in a case involving the denial of health care benefits to a gay employee of a religious institution. *Id.* at 121–22. The case arose from the certification of certain questions by the United States District Court for the District of Maryland to the Maryland Supreme Court, *see* Md. Code Ann., Cts. & Jud. Proc. § 12–603 (West 2020), one of which related to the MFEPA religious exemption:

> Whether, under Md. Code Ann., State Gov't § 20-604(2), the Maryland Fair Employment Practices Act applies to a religious corporation, association, education institution, or society with respect to the employment of individuals of a particular sexual orientation or gender identity to perform work connected with all activities of the religious entity or only those that are religious in nature.

*Doe*, 300 A.3d at 121. In answering that question, the Maryland Supreme Court analyzed the statutory language and its legislative history and ultimately gave the MFEPA religious exemption "its narrowest reasonable reading." *Id.* at 132. The court held that the term "work connected with the activities of the religious entity" is to be read "as limiting the application of the exemption based on the type of work performed by the employee" and concluded that the Maryland legislature "intended to exempt religious organizations from these kinds of MFEPA claims brought by employees who perform duties that directly further the core mission (or missions) of the religious entity," whether the mission is religious or secular. *Id.* Thus, a position focused on secular activities, such as "the executive director of a medium-sized religious charity, which has as its core mission the raising of funds to build new schools in underserved communities," would be subject to the exemption if the position is central to a secular mission of a religious entity. *See id.* at 136.

5

As guidance to courts on how to determine whether an employee's work directly furthers a core mission of the religious entity, the Maryland Supreme Court identified five considerations. First, it stated that the inquiry is "fact-intensive" and "requires consideration of the totality of the pertinent circumstances." *Id.* Second, it stated that "directly" furthering the core mission of a religious entity refers to duties "that are not one or more steps removed from taking the actions that effect the goals of the entity." *Id.* Providing an example, the court noted that a janitor who cleans the headquarters office of a religious entity only indirectly furthers the core mission of the religious entity by enabling the work of others whose work more directly furthers the core mission. *Id.* Third, the court stated that the size of the religious entity may be relevant in that a small organization "may well have fewer employees whose work does not directly further the core mission(s)." *Id.* Fourth, the court noted that a religious entity may have multiple core missions that could be religious, secular, or both. *Id.* Finally, the court identified factors that a court might consider in determining what constitutes a core mission of a religious entity, such as "the description of its mission(s) that the entity provides to the public and/or regulators; the services the entity provides; the people the entity seeks to benefit; and how the entity's funds are allocated." *Id.* at 137. The court cautioned that this list of factors was "by no means an exhaustive list" and directed that a court should "consider the totality of the circumstances that shed light on an entity's core mission(s)." *Id.* at 137 n.20. In considering all of these factors, the court emphasized that the inquiry into whether work directly furthers the core mission of the religious entity "should not require analysis of religious doctrine." *Id.* at 136.

### III.    Plaintiffs' Claims

In their Complaint, Plaintiffs assert that there are seven ways in which the MFEPA religious exemption, as interpreted by the Maryland Supreme Court, violates the United States

6

Constitution, in the following numbered counts: (1) the exemption violates Plaintiffs' church autonomy rights under the Religion Clauses of the First Amendment; (2) it violates the Establishment Clause of the First Amendment because it excessively entangles government with religion; (3) it violates the Free Exercise Clause of the First Amendment; (4) it violates the Establishment Clause by discriminating against Plaintiffs based on their denomination; (5) it violates Plaintiffs' First Amendment right to expressive association; (6) it violates Plaintiffs' First Amendment right to assembly; and (7) it violates the right to due process of law under the Fifth and Fourteenth Amendments because it is unconstitutionally vague.

## DISCUSSION

In their Motion, Plaintiffs seek a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a) that would enjoin the enforcement of the MFEPA against Plaintiffs in relation to its practice of hiring only members of the Seventh-day Adventist Church. In their Motion, Defendants seek dismissal of all seven counts for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

## I. Motion for a Preliminary Injunction

In the Motion for a Preliminary Injunction, Plaintiffs seek an injunction that would allow them, during the pendency of this litigation, to continue their employment practice of hiring only members of the Seventh-day Adventist Church as their employees, regardless of the position, without concern that an MFEPA enforcement action would be brought against them.

### A. Legal Standard

To obtain a preliminary injunction, moving parties must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). A moving party must satisfy each requirement as articulated. *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013). Because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

### B.    Likelihood of Success on the Merits

The first requirement for a preliminary injunction is that the moving party demonstrate a likelihood of success on the merits of its claims. For purposes of the Motion, Plaintiffs argue that they are likely to succeed on the merits of their claims in Counts 1, 2, and 3.

### 1.    Count 1: Church Autonomy

In Count 1, Plaintiffs argue that the application of the Maryland Supreme Court's interpretation of the MFEPA religious exemption would violate their "church autonomy rights" under the First Amendment. Mot. Prelim. Inj. at 10, ECF No. 15-1. Under the "general principle of church autonomy," which derives from the Establishment Clause and the Free Exercise Clause (collectively, "the Religion Clauses") of the First Amendment, religious institutions generally should have "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049, 2061 (2020).

This principle is derived from a line of United States Supreme Court cases involving disputes over the control of church property and the selection and supervision of clergy. *See id.* (citing *Watson v. Jones*, 80 U.S. 679, 728–29, 733–35 (13 Wall. 679) (1871) (addressing a dispute about the control of church property and requiring courts to defer to churches on the resolution of issues of religious doctrine); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S 94, 107, 116 (1952) (concluding that the state court improperly adjudicated a dispute

8

over the control of church property and the appointment and authority of clergy); and *Serbian E. Orthodox Diocese for the U.S. & Canada v. Milivojevich*, 426 U.S. 696, 709–10, 720–22, 724–25 (1976) (requiring courts to defer to church resolution of religious disputes related to control of church property and organization of church structure and administration)); *see also Bouldin v. Alexander*, 82 U.S. 131, 137–39 (1872) (recognizing a court's jurisdiction over the property rights of a church but not over "ordinary acts of church discipline, or of excision from membership").

As to whether this principle can be applied to exempt religious institutions from having to comply with employment discrimination laws, the Supreme Court has addressed this question in adopting what is known as the "ministerial exception." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012). In *Hosanna-Tabor*, the Court considered whether a teacher at a religious school who was deemed "called" to service by God and was designated as a "commissioned minister" could bring a civil action against her employer for disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12112, 12203. *Hosanna-Tabor*, 565 U.S. at 177–80. The Court held that there is a "ministerial exception" that bars an employment discrimination claim against a religious institution by a minister because under the Religion Clauses, "[r]equiring members of a religious group to accept or retain an unwanted minister, or punishing a church for failing to do so," interferes "with the internal governance of the church" by "depriving the church of control over the selection of those who will personify its beliefs." *Id.* at 188. Such an action would therefore infringe on the Free Exercise Clause, "which protects a religious group's right to shape its own faith and mission through its appointments," and the Establishment Clause, which "prohibits government involvement in such ecclesiastical decisions." *Id.* at 188–89. In concluding that the ministerial exception applied to bar the plaintiff teacher's employment discrimination claim, the Court applied a fact-specific,

9

totality-of-the-circumstances inquiry that considered such factors as the individual's title, religious training, relative position in the organization, and job duties that directly related to the conveying of the church's message and carrying out of its mission. *Id.* at 190–92.

In *Our Lady of Guadalupe School*, the Supreme Court clarified the ministerial exception in the context of employment discrimination claims under the ADA and the Age Discrimination in Employment Act ("ADEA") asserted by teachers at religious schools and held that the factors identified in *Hosanna-Tabor* were not a checklist or "rigid formula," and that the test for whether an employee qualifies as a minister is a functional one. *Our Lady of Guadalupe School*, 140 S. Ct. at 2064, 2067, 2069. Under this approach, the Court held that two teachers at Catholic elementary schools who had "the responsibility of educating and forming students in the faith" were covered by the ministerial exception, such that their employment discrimination claims could not proceed. *Id.* at 2055, 2069.

Plaintiffs argue that the Maryland Supreme Court's recent interpretation of the MFEPA violates the principle of church autonomy, and thus the Religion Clauses, by rendering unlawful Plaintiffs' religious practice of hiring only Seventh-day Adventists.   Recognizing that the ministerial exception does not justify such a hiring practice for all positions, Plaintiffs argue that the church autonomy principle is "distinct from the ministerial exception as it protects membership and employment decisions *rooted in religious beliefs* but applies to *all* Church members and employees—not just ministers." Mot. Prelim. Inj. at 12. Accordingly, Plaintiffs ask the Court to apply the principle of church autonomy to allow them to hire only members of their own faith for all employment positions.

The Court declines to do so.   To date, neither the Supreme Court nor the United States Court of Appeals for the Fourth Circuit has provided any basis to conclude that the church

autonomy principle protects such a practice. In *Our Lady of Guadalupe School*, the Supreme Court specifically grounded the ministerial exception in the "general principle of church autonomy," including the need for religious institutions to have "independence in matters of faith and doctrine," yet limited the application of this principle to the "ministerial exception" that "courts are bound to stay out of employment disputes involving those holding *certain important positions with churches and other religious institutions*." 140 S. Ct. at 2060–61 (emphasis added).

Similarly, the Fourth Circuit has consistently applied the ministerial exception as the First Amendment vehicle by which a religious institution could shield its employment decisions from employment discrimination claims. *See e.g.*, *Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 326, 328 (4th Cir. 2024) (stating that "the ministerial exception is a 'well-settled' doctrine"); *EEOC v. Roman Cath. Diocese of Raleigh*, 213 F.3d 795, 800–01 (4th Cir. 2000); *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1396–97 (4th Cir. 1990); *Rayburn v. Gen. Conf. of Seventh-day Adventists*, 772 F.2d 1164, 1168–69 (4th Cir. 1985). In *Roman Catholic Diocese of Raleigh*, the Fourth Circuit made clear that the ministerial exception is the manifestation of the church autonomy principle when it stated that it "is rooted in the independence of the spiritual lives of religious bodies" and "shelters certain employment decisions from the scrutiny of civil authorities so as to preserve the independence of religious institutions in performing their spiritual functions." 213 F.3d at 800–01. Yet it expressly placed limits on its reach by stating that "[t]he ministerial exception does not insulate wholesale the religious employer from the operation of federal anti-discrimination statutes" and "would not apply to employment decisions concerning purely custodial or administrative personnel." *Id.* at 801. Notably, the court then held that "[w]here no spiritual function is involved, the First Amendment does not stay the application of a generally applicable law such as Title VII to the religious employer unless Congress so provides."

11

*Id.* This articulation of the reach of the First Amendment in the area of employment discrimination is distinctly inconsistent with Plaintiffs' claim that the church autonomy principle requires that religious employers be exempted from a law barring religious discrimination as to all employees.

Significantly, in *Billard*, in which a teacher at a Catholic school was effectively terminated after marrying his same-sex partner because the action violated a policy against conduct contrary to the "moral teachings of the Catholic faith," the defendant advanced the same argument offered here—that "the 'church autonomy' doctrine protects religious organizations against discrimination claims brought by certain employees who fall outside the scope of the traditional ministerial exception"—and even waived reliance on the ministerial exception. 101 F.4th at 322–23. After the district court held that the "'church autonomy' doctrine is limited to . . . the ministerial exception," the Fourth Circuit declined to consider the defendant's church autonomy argument and, after determining that it could overlook the waiver, ruled in favor of the defendant based only on the ministerial exception. *Id.* at 324–25. Where the Fourth Circuit has declined the opportunity to extend the ministerial exception, through the church autonomy principle, to cover all employees of a religious institution, this Court will not do so.

Plaintiffs' citation to out-of-circuit case law does not alter the Court's conclusion. Although Plaintiffs have identified cases illustrating that the principle of church autonomy may in some instances prevent a court from adjudicating claims that require evaluation of religious doctrine and beliefs, none apply the principle as a basis upon which to conclude that the First Amendment requires that a religious institution be allowed to hire only members of its own religion for all positions. In *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 656 (10th Cir. 2002), the United States Court of Appeals for the Tenth Circuit held that the principle of church autonomy barred the court from considering whether internal letters, handouts, and

12

church meetings discussing a church's position on homosexuality effected sexual harassment against a youth minister because the statements themselves were protected from court analysis under that principle. *Id.* at 658. Likewise, in *Curay-Cramer v. Ursuline Academy of Wilmington*, 450 F.3d 130, 140 (3d Cir. 2006), the United States Court of Appeals for the Third Circuit dismissed a Title VII claim brought by a Catholic school teacher who was fired after she signed her name to a pro-choice newspaper advertisement and claimed that male employees were treated more favorably for similar alleged misconduct, on the grounds that a ruling on the claim "would require an analysis of Catholic doctrine" to determine whether the alleged misconduct of the plaintiff and any identified comparator employees were sufficiently similar in significance. *Id.* at 132, 140; *see also Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 865, 872 (N.D. Ill. 2019) (dismissing a sex discrimination claim of a religious institution instructor terminated because she advocated for women to serve in the clergy based in part on the principle of church autonomy because the court would need to engage in an evaluation of religious doctrine in order to address the claim, but allowing her to amend the complaint to assert other sex discrimination claims not tied to religious beliefs such as claims based on antagonistic treatment by male colleagues); *Aparicio v. Christian Union, Inc.*, No. 18-cv-592, 2019 WL 1437618, at *9 (S.D.N.Y. Mar. 29, 2019) (dismissing a claim by an employee that he was terminated for opposing the defendant's policy of barring women from serving as directors in its ministry because "courts cannot hinder a religious institution's right to select who performs its spiritual functions").

In another case cited by Plaintiffs, *Darren Patterson Christian Academy v. Roy*, 699 F. Supp. 3d 1163 (D. Colo. 2023), although the plaintiff invoked the principle of church autonomy in arguing that the First Amendment required that it be allowed to hire only members of its own religion despite a requirement of non-discrimination as a condition of participating in a universal

13

preschool program, the court applied only the ministerial exception in finding that the non-discrimination policy likely violated its rights "by interfering with the school's selection of key employees." *Id.* at 1174, 1184.

The fact that Plaintiffs claim only to seek the right, under the First Amendment, to discriminate on the basis of religion in order to hire employees of their own faith, rather than other forms of employment discrimination, does not justify the requested extension of the ministerial exception. Although the existing case law does not specifically address whether the church autonomy principle should be extended to allow a religious institution to hire only its own members, likely because Title VII contains a specific exemption on this issue, 42 U.S.C. § 2000e-1; *Amos*, 483 U.S. at 329–30, the Fourth Circuit effectively rejected the premise of Plaintiffs' claim by stating that while "[s]ome religious institutions may ask all employees, whatever their roles, to model religious values," the court "do[es] not suggest that such an expectation would bring all such employees within the ministerial exception." *Billard,* 101 F.4th at 332. Moreover, at the hearing on the Motions, Plaintiffs' counsel took the position that if the Court finds that the First Amendment permits them to engage in religious discrimination in order to hire only their own members for all positions, they would take the position that with such authority, they would be permitted to engage in other forms of discrimination, other than race discrimination, if they are based on their religious beliefs. Hrg. Tr. at 75–77, ECF No. 36. Such a position, however, effectively amounts to an extension of the ministerial exception to cover all employees. As discussed above, the Court finds such an extension incompatible with the Fourth Circuit's pronouncements on this issue. Accordingly, the Court declines to create and apply a test other than the ministerial exception to assess whether the First Amendment church autonomy principle requires that a religious institution be permitted to hire only members of its own religion.

14

Finally, even assuming that the church autonomy principle could provide a basis to invalidate the MFEPA religious exemption, the allegations do not demonstrate likely success on this theory. Under that exemption as interpreted by the Maryland Supreme Court, a court expressly need not evaluate religious doctrine and beliefs. *Doe*, 300 A.3d at 136 ("Determining whether this standard is met in a particular case should not require analysis of religious doctrine or otherwise result in courts being caught in a 'theological thicket.'"). Importantly, the exemption is not dependent on whether an employee's duties are religious or secular in nature but instead is based on whether the employee's role "directly" furthers the core mission of the religious entity, which may be secular, such as in the case of an entity engaged in charitable works, as opposed to being "one or more steps removed from taking the actions that effect the goals of the entity," as would be the case for a janitor whose role enables the work of those who directly further the core mission. *Id.* Where *Doe* counsels that the identification of the core mission of a religious entity can be based on sources such as the entity's public descriptions and how its funds are allocated, *id.* at 137, the application of the MFEPA religious exemption analysis likely requires less consideration of religious beliefs than for application of the ministerial exception. Accordingly, the MFEPA religious exemption does not require an unprecedented intrusion on church autonomy so as to necessitate a new application of it in the area of employment discrimination beyond the ministerial exception.

For all of these reasons, the Court finds that Plaintiffs are unlikely to succeed on the merits of their church autonomy claim in Count 1.

### 2.    Count 2: Excessive Entanglement

Plaintiffs next argue that the Maryland Supreme Court's interpretation of the MFEPA violates the Establishment Clause because it causes an "excessive entanglement" between

15

government and religion by mandating a fact-intensive inquiry that requires "government involvement in all aspects of Plaintiffs' employment practices" in order to determine whether the religious exemption applies. Mot. Prelim. Inj. at 19.

Plaintiffs' "excessive entanglement" claim derives primarily from *Rayburn v. General Conference of Seventh-day Adventists*, 772 F.2d 1164 (4th Cir. 1985), which applied the three-part test established in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), for determining whether a government action violates the Establishment Clause. *Rayburn*, 772 F.2d at 1170. Under that test, to be constitutional, (1) the statute "must have a secular legislative purpose"; (2) "its principal or primary effect must be one that neither advances nor inhibits religion"; and (3) it "must not foster 'an excessive government entanglement with religion.'" *Lemon*, 403 U.S. at 612–13 (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 674 (1970)). In order to determine whether there was such excessive government entanglement, courts considered "the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority." *Id.* at 15.

The Supreme Court, however, has since abandoned the *Lemon* test. *See Kennedy v. Bremerton Schs.*, 142 S. Ct. 2407, 2427 (2022) (stating that the Supreme Court "long ago abandoned" *Lemon*). In its stead, the Supreme Court now instructs that "the Establishment Clause must be interpreted by 'reference to historical practices and understandings'" and that the analysis must focus on "original meaning and history." *Id.* at 2428 (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)). Since *Kennedy*, the Fourth Circuit has had occasion to consider an Establishment Clause claim in *Firewalker-Fields v. Lee*, 58 F.4th 104 (4th Cir. 2023), in which the court was presented with a claim that a jail's practices violated the Establishment Clause by substantially burdening a prisoner's Islamic faith while unconstitutionally favoring Christianity.

16

*Id.* at 111. In that case, the court confirmed that the *Lemon* test is no longer applicable and ruled that in light of *Kennedy*, the claim had to be remanded to the district court to apply the new history-and-tradition test. *Id.* at 111, 121–22.

As to Count 2, however, both Plaintiffs and Defendants apply the now-defunct test for excessive entanglement derived from *Lemon* and articulated in *Rayburn*. Indeed, Plaintiffs rely significantly on cases invoking the *Lemon* test. *See Rayburn*, 772 F.2d at 1165, 1170 (after concluding that the ministerial exception barred the plaintiff's employment discrimination claim based on her non-selection for a pastoral position, applying *Lemon* and alternatively barring the claim because applying Title VII to such a decision "would result in an intolerably close relationship between church and state"); *NLRB v. Cath. Bishop of Chicago*, 440 U.S. 490, 501–02, 504, 507 (1979) (relying on *Lemon* in concluding that having the National Labor Relations Board exercise jurisdiction over teachers at church-operated schools raised "serious First Amendment questions," then finding no such jurisdiction because Congress did not expressly grant it); *EEOC v. Cath. Univ. of Am.*, 83 F.3d 455, 457, 465–67 (D.C. Cir. 1996) (applying *Lemon* to dismiss a Title VII sex discrimination based on the denial of tenure to a nun who was a professor of canon law and "the functional equivalent of a minister" because applying Title VII to her claim would require "impermissible entanglement" with judgments of the Department of Canon Law and thus would violate the Establishment Clause). Notably, in *Rayburn*, the court held that even upon consideration of *Lemon* and the Establishment Clause, the Church's "employment decisions may be subject to Title VII scrutiny, where the decision does not involve the church's spiritual functions," such that *Rayburn* does not provide a basis for concluding that the First Amendment bars religious discrimination claims relating to all positions. *Rayburn*, 772 F.2d at 1171. Where

Plaintiffs' Establishment Clause claim based on excessive entanglement relies on an outdated and thus inapplicable test, this Court does not find a likelihood of success on the merits of this claim.

Although Plaintiffs have identified various cases referencing concerns about excessive government entanglement outside the context of *Lemon*, many merely caution against or raise questions regarding government entanglement with religion, and none find an Establishment Clause violation based only on excessive entanglement. For example, in *Carson v. Makin*, 142 S. Ct. 1987 (2022), the Supreme Court, in finding that the exclusion of religious schools from a school voucher program violated the First Amendment, noted that the inquiry into whether and how a religious school pursues its educational mission would "raise serious concerns about state entanglement with religion" but based its ruling on the Free Exercise Clause, not the Establishment Clause or any separate "excessive entanglement" doctrine. *Id.* at 2001–02. In *Walz v. Tax Commission of the City of New York*, 397 U.S. 664 (1970), a case that pre-dated *Lemon*, the Supreme Court considered the issue of excessive entanglement in evaluating an Establishment Clause challenge to a state tax exemption for places of worship but also considered other factors, including the legislative purpose and the history and tradition of such tax exemptions, and ultimately concluded that the exemption was consistent with the First Amendment. *Id.* at 670, 674–75, 680. In *Does 1-11 v. Board of Regents of the University of Colorado*, 100 F.4th 1251 (10th Cir. 2024), while the court referenced "excessive entanglement" in finding that a religious exemption to a vaccine mandate limited to individuals who could justify the exemption based on official doctrine of an organized religion violated the Establishment Clause, the court also relied significantly on the conclusion that the exemption effected denominational discrimination, a separate kind of Establishment Clause violation which, as discussed below, is not present here. *See id.* at 1270 (relying on the "clearest command" of the Establishment Clause that "one religious

denomination cannot be preferred over another"); *infra* part II.C. Moreover, the "excessive entanglement" included having the government "pronounce[] the 'official doctrine'" of each religious sect. *Does 1–11*, 100 F.4th at 1272. Nothing like that is contemplated here.

Finally, to the extent that Plaintiffs advance an argument that "excessive entanglement" alone renders the MFEPA religious exemption unconstitutional, that argument overlaps almost entirely with their argument based on church autonomy. Indeed, at the hearing, Plaintiffs acknowledged that their excessive entanglement argument "is very closely tied into the church autonomy doctrine," Hrg. Tr. at 21–22, and later that they did not need it "as an independent grounds" for relief, *id.* at 23. Thus, to the extent that, as discussed above, application of the MFEPA religious exemption would not intrude on church autonomy to the degree that it would violate the First Amendment, the same analysis demonstrates that there is likely no violation based on excessive entanglement between government and religion. *See supra* part I.B.1.

For all of these reasons, the Court finds that Plaintiffs have not established a likelihood of success on the merits of the claim in Count 2.

### 3.    Count 3: Free Exercise

Plaintiffs next argue they are likely to succeed on the merits of their claim in Count 3 that the MFEPA religious exemption as interpreted by the Maryland Supreme Court violates the Free Exercise Clause of the First Amendment.

The Free Exercise Clause provides that the government "shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. I. This provision generally bars "all government regulation of religious beliefs" and of acts engaged in for religious reasons. *Emp. Div., Dep't of Hum. Res. v. Smith*, 494 U.S. 872, 877 (1990). However, the Free Exercise Clause does not generally provide that individual religious beliefs can excuse "compliance with an otherwise valid

19

law prohibiting conduct that the State is free to regulate" that is "not aimed at the promotion or restriction of religious beliefs," because "[t]he mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities." *Id.* at 879 (quoting *Minersville Sch. Dist. Bd. of Ed. v. Gobitis*, 310 U.S. 586, 594–95 (1940)). Thus, a law that is "neutral and generally applicable," even one that has the incidental effect of burdening religious exercise, is subject only to rational basis review, under which it will be upheld if is "rationally related to a legitimate governmental interest." *Canaan Christian Church v. Montgomery Cnty.*, 29 F.4th 182, 198–99 (4th Cir. 2022); *see also Fulton v. City of Phila.*, 141 S. Ct. 1868, 1876 (2021) (citing *Smith*, 494 U.S. at 878–82).

Laws that are not neutral or generally applicable, however, are subject to heightened scrutiny. *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993). A law is not neutral and generally applicable if, for example, it intentionally discriminates against or targets religious practice, "invites the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions,'" or "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877 (quoting *Smith*, 494 U.S. at 884). Such a law is subject to strict scrutiny and may be upheld "only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Id.* at 1881 (quoting *Church of Lukumi Babalu Aye, Inc.*, 508 U.S. at 546).

Laws that disqualify recipients of public benefits solely because of their religious character are also subject to strict scrutiny under the Free Exercise Clause. *See Carson*, 142 S. Ct. at 1996; *Espinoza v. Mont. Dep't of Rev.*, 140 S. Ct. 2246, 2260 (2020) (citing *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021–22 (2017)); *Gracehaven, Inc. v. Montgomery*

20

*Cnty. Dep't of Job & Family Servs.*, No. 24-cv-325, 2025 WL 1158079, at \*3 (S.D. Ohio Apr. 21, 2025). Where public benefits or contracts are not at issue in this case, the Court will focus its inquiry on whether MFEPA is neutral and generally applicable.

The parties primarily disagree on whether the MFEPA is a "neutral and generally applicable" law that "incidentally burden[s]" the exercise of religion and thus warrants only rational basis review, or whether it falls outside of this category and is thus subject to strict scrutiny. *Fulton*, 141 S. Ct. at 1876; *Canaan Christian Church*, 29 F.4th at 199. On its face, the MFEPA is neutral in that it does not single out religious institutions for adverse treatment. *Cf. Church of Lukumi Babalu Aye, Inc.*, 508 U.S. at 527–28, 542 (finding that a law that prohibited animal sacrifice was not neutral because it unconstitutionally targeted slaughter of animals for religious rituals). Plaintiffs argue that the MFEPA is not neutral or generally applicable for two reasons: (1) because it treats comparable secular activities more favorably; and (2) because it has a system of individualized exemptions.

### a.    Comparable Secular Activity

As to the comparable secular activity inquiry, a law is not generally applicable if it "treat[s] *any* comparable secular activity more favorably than religious exercise," *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021), such as by "prohibit[ing] religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," *Fulton*, 141 S. Ct. at 1877. Whether a religious activity and a secular activity are comparable under this inquiry "must be judged against the asserted government interest that justifies the regulation at issue." *Tandon*, 141 S. Ct. at 1294. For example, in *Tandon*, the Supreme Court held that a state law restricting in-person gatherings due to the COVID-19 pandemic that barred in-home religious activities from including more than three households at a time was not generally applicable

21

because it treated certain comparable secular activities more favorably than religious exercise by permitting hair salons, retail stores, personal care services, movie theaters, sporting events, concerts, and indoor restaurants to have gatherings of more than three households at a time. *Id.* at 1297. The Court reasoned that where the stated government interest was in preventing the spread of COVID-19, the law was not generally applicable because it treated certain secular activities that contributed to the spread of COVID-19 more favorably than the identified religious activities without any showing that the secular activities posed a lesser risk of transmission. *Id.*

Here, Plaintiffs point to four exemptions in the MFEPA as demonstrating that the law treats comparable secular activities more favorably than religious activities in relation to the government interest in preventing religious discrimination in employment. The MFEPA exempts from its non-discrimination requirement: (1) employers with fewer than 15 employees, Md. Code, State Gov't § 20–601(d)(1)(i)(2); (2) employers that "observ[e] the terms of a bona fide seniority system or any bona fide employee benefit plan," *id.* § 20–605(a)(4); (3) certain tax-exempt bona fide private membership clubs, *id.* § 20–601(d)(3); and (4) educational institutions that are "wholly or substantially owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, or society," which have a separate, explicit exemption to allow them to hire employees of their own particular religion, *id.* § 20–605(a)(3).

Three of these exemptions are neutral and generally applicable in that they apply to religious and secular activities alike. The MFEPA's exemptions for employers with fewer than 15 employees and for employers that observe the terms of a bona fide seniority system or benefit plan, even while drawing a distinction among employers, are neutral and generally applicable because they exempt employers—religious and nonreligious—in the same way without favoring comparable secular activities.

22

As for the exemption for private membership clubs, the MFEPA's definition of "employer" exempts from the statute's coverage "a bona fide private membership club that is exempt from taxation under § 501(c) of the Internal Revenue Code." Md. Code Ann., State Gov't § 20-601(d)(3). The definitions in the Internal Revenue Code establish that this exemption applies to both religious and secular membership clubs. Section 501(c) defines such tax-exempt clubs as including "[c]lubs organized for pleasure, recreation, and other nonprofitable purposes, substantially all of the activities of which are for such purposes and no part of the net earnings of which inures to the benefit of any private shareholder," 26 U.S.C. § 501(c)(7), and "[d]omestic fraternal societies, orders, or associations, operating under the lodge system" that devote their net earnings "exclusively to *religious*, charitable, scientific, literary, educational, and fraternal purposes," *id.* § 501(c)(10) (emphasis added). The fact that these definitions include both secular and religious membership clubs is illustrated by section 501(i) of the Internal Revenue Code, which withholds tax exempt status from social clubs described in § 501(c)(7) that engage in discrimination but specifically excludes from this provision, as to religious discrimination, a club "which in good faith limits its membership to the members of a particular religion in order to further the teachings or principles of that religion." *Id.* § 501(i)(2). Thus, the private membership clubs referenced in § 501(c), which by extension are the clubs subject to the MFEPA religious exemption, include both clubs with religious purposes and those with secular purposes.

Indeed, in the analogous context of Title VII, which uses the same bona fide private membership club language as the MFEPA, *see* 42 U.S.C. § 2000e(b)(2), courts have applied a United States Equal Employment Opportunity Commission test for determining whether an organization is a "bona fide private membership club" that focuses on the degree to which the organization is truly private and does not consider whether its purpose is religious or secular. *See*

*EEOC v. Chicago Club*, 86 F.3d 1423, 1433, 1435 (7th Cir. 1996) (articulating and adopting a three-part test considering the extent to which the club limits its facilities to club members and guests, the extent to which it is controlled or owned by its membership, and whether and to what extent it publicly advertises to solicit members or promote use of its facilities by the public); *Graham v. Leavenworth Country Club*, 15 F. Supp. 2d 1062, 1063 (D. Kan. 1998) (same). Accordingly, like the small business and seniority system exemptions, the bona fide private membership club exemption applies regardless of whether the organization is religious or secular.

In *Kim v. Board of Education of Howard County*, 93 F.4th 733 (4th Cir. 2024), the Fourth Circuit addressed an analogous circumstance when it found that a law that permitted only public school students to vote in an election for a student member of the county school board overseeing the public schools was neutral and generally applicable even though it had the effect of treating students at religious private schools differently. *Id.* at 736, 748. The court reasoned that the law, which drew a distinction based on public school enrollment, was neutral and generally applicable because it made no distinction between students at religious and nonreligious private schools and thus barred "non-public-school students, religious and nonreligious alike," and because it had the effect of treating students at religious schools differently "'in spite of' and not 'because of' those students' religious reasons for forgoing public education." *Id.* at 748 (quoting *Alive Church of the Nazarene, Inc. v. Prince William Cnty.*, 59 F.4th 92, 108 (4th Cir. 2023)).

Likewise, the exemptions that treat small employers, those with established seniority systems, or those that constitute private membership clubs differently from other employers draw no distinction, explicitly or implicitly, between religious and nonreligious employers and provide the same exemption to any religious employer of the requisite size or with the requisite seniority policy or private membership club status. *See id.* These exemptions therefore differ from those

24

in *Tandon*, in which the California law exempted certain specific secular activities involving comparable numbers of people and with comparable impact. 141 S. Ct. at 1296–97. They also differ from the exemptions in *Church of Lukumi Babalu Aye*, which exempted the secular activity of commercial animal slaughter for food from an ordinance prohibiting the killing of animals and left religious animal sacrifice as "almost the only conduct" subject to the ordinance. 508 U.S. at 535–36. For a large religious organization, one without a seniority policy, or one that does not constitute a private membership club, the comparable secular activity would be that of a large secular organization without a seniority policy that does not constitute a private membership club, and under the MFEPA, such organizations are not exempt. The Court therefore finds that even with these exemptions, the MFEPA is a neutral and generally applicable law.

Notably, another judge in this District has recently rejected the argument that the MFEPA is not neutral and generally applicable because of the exemption for employers of fewer than 15 employees in part because "a religious employer of fewer than 15 employees . . . would be exempt from MFEPA in the same manner as would be a secular employer with fewer than 15 employees." *See Doe v. Cath. Relief Servs.*, No. 20-cv-1815-JRR, 2025 WL 1158695 at \*16 (D. Md. Apr. 21, 2025); *see also McMahon v. World Vision, Inc.*, 704 F. Supp. 3d 1121, 1142–43 (W.D. Wash. 2023) (holding that "the mere existence of an exemption for *all small* employers—religious and secular alike—does not transform Title VII" and the Washington state anti-discrimination law "from neutral and generally applicable laws into those triggering strict scrutiny"). *But see Union Gospel Mission of Yakima v. Ferguson*, No. 23-cv-3027, 2024 WL 4660918, at \*3 (E.D. Wash. Nov. 1, 2024) (holding that the Washington anti-discrimination law is not neutral and generally applicable because its exemption for small employers places "for-profit, non-religious organizations on unequal footing" with religious organizations).

Plaintiffs argue that under *Tandon*, "the relevant distinction is between *reasons for an exception* that are secular and *reasons for an exception* that are religious." Prelim. Inj. Reply & Opp'n Mot. Dismiss at 11, ECF No. 30-1. Plaintiffs, however, cite no authority for this novel proposition other than an unpublished district court case from another circuit. More importantly, this reasoning cannot be squared with *Tandon* or *Kim*. *Tandon*, in focusing on whether a religious activity was treated less favorably than comparable secular activity, stated that the requirement of comparability is "judged against the asserted government interest that justifies the regulation at issue," and where that interest was in limiting the spread of COVID-19, it considered whether impact of the religious and secular activities on that undisputedly secular interest was comparable, not on whether the reasons for the requested exceptions were comparable. *See* 141 S. Ct. at 1296–97 ("Comparability is concerned with the risks various activities pose, not the reasons why people gather"). In *Kim*, the reason for permitting only public school students to vote in the school board election, which the Fourth Circuit presumed was a government interest in "making room for student perspectives on its school boards or providing students with civics training," was entirely secular in nature, and no exception for religious private schools based on religious reasons was permitted, yet the court held that the law remained neutral and generally applicable because secular and religious private school students were treated in the same manner in relation to the relevant government interest. *See* 93 F.4th at 748–49. Plaintiffs' argument is therefore inconsistent with the reasoning set forth in controlling authority.

The final MFEPA exemption referenced by Plaintiffs is the exemption for religiously owned or controlled educational institutions. Because this exemption is specifically religious, Plaintiffs argue this exemption is not generally applicable because it does not apply to secular organizations. However, the comparable secular activity test directs courts to consider whether a

law "treat[s] any comparable secular activity *more* favorably than religious exercise." *Tandon*, 141 S. Ct. at 1296 (emphasis added). Where this exemption treats secular activity *less* favorably than religious exercise by not exempting secular schools, colleges, or universities from the MFEPA's non-discrimination requirements, it does not provide a basis to find that the MFEPA is not neutral and generally applicable.

### b.   Individualized Exemptions

Plaintiffs also argue that the MFEPA is not neutral or generally applicable because it has a system of individualized exemptions. Such a system exists when a law provides a "mechanism for individualized exemptions" that "invites the government to consider the particular reasons for a person's conduct." *Fulton*, 141 S. Ct. at 1877 (quoting *Smith*, 494 U.S. at 884). Here, Plaintiffs point to a provision within the MFEPA which allows otherwise discriminatory personnel decisions based on a protected class, specifically, "sex, age, religion, national origin, disability, or military status," where that characteristic is a "bona fide occupational qualification reasonably necessary to the normal operation of that business or enterprise." Md. Code, State Gov't § 20–605(a)(1). Plaintiffs argue that whether a qualification is reasonably necessary is a discretionary, case-by-case determination that is constitutionally suspect and triggers strict scrutiny.

Such a determination, however, is not the same as the individualized, discretionary exemption contemplated in the case law. In *Fulton*, the plaintiff challenged the bar on Catholic Social Services receiving a contract with the City of Philadelphia to place children in foster care because its policy of not considering prospective foster parents in same-sex marriages violated the City's non-discrimination requirements. 141 S. Ct. at 1874–75. The Court held that the City's standard foster care contract was not neutral and generally applicable because it allowed the City Commissioner to grant individualized exemptions to the non-discrimination provision based on

27

"his/her sole discretion." *Id.* at 1878. In *Sherbert v. Verner*, 374 U.S. 398 (1963), in which a member of the Seventh-day Adventist Church challenged a denial of unemployment benefits based on her failure to accept "suitable work" offered to her because the job would have required her to work on the Sabbath, the Court held that the eligibility requirements violated the Free Exercise Clause, *id.* at 399–401, and in later cases, the Supreme Court has stated that the unemployment benefits provision in that case was not "generally applicable" because it contained a provision allowing benefits to be granted upon a showing of "good cause," which effectively constituted an individualized exemption, *see Fulton*, 141 S. Ct. at 1877–78 (noting that the good cause provision in *Sherbert* was an individualized exemption). In contrast, "an exemption is not individualized simply because it contains express exceptions for objectively defined categories of persons." *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 288–89 (2d Cir. 2021) (per curiam) (collecting cases).

Unlike in the individualized exemptions in *Fulton* and *Sherbert* that were entirely subject to the discretion of the decisionmaker, here, the "bona fide occupational qualification" ("BFOQ") provision establishes an affirmative defense, available to religious and secular employers alike, subject to defined criteria. *See* Md. Code Regs. 14.03.02.08 (2025) (listing the BFOQ provision of the MFEPA among "Affirmative Defenses"); *cf. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 201 (1991) (describing Title VII's BFOQ provision as a "defense" and stating that it "prevents the use of general subjective standards and favors an objective, verifiable requirement"). In fact, the MFEPA BFOQ defense is subject to certain criteria set forth in Maryland regulations. *See* Md. Code Regs. 14.03.02.08 Accordingly, it does not constitute the kind of individualized exemption system that renders a statute not neutral and generally applicable.

28

### c.    Rational Basis Review

Because the MFEPA is a neutral and generally applicable law, it does not require strict scrutiny and instead is subject only to rational basis review. *Canaan Christian Church*, 29 F.4th at 199. Where the State's stated purpose is to prevent discrimination in employment, the Court sees no basis to find that the MFEPA does not further that goal. *See Rayburn*, 772 F.2d at 1168 (stating that "[i]t would, of course, be difficult to exaggerate the magnitude of the state's interest in assuring equal employment opportunities for all"). Plaintiffs presently offer no persuasive argument that the MFEPA does not further this interest or that the statute does not satisfy rational basis review. Accordingly, the Court finds that Plaintiffs are unlikely to succeed on the merits of Count 3.

### C.    Remaining Factors

Because the Court does not find a likelihood of success on the merits of Plaintiffs' claims relating to the Motion, the Court need not address the remaining factors. *See Pashby*, 709 F.3d at 320. Even if they were considered, the remaining factors collectively weigh against a preliminary injunction. To establish irreparable harm, a plaintiff "must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). Generally, the denial of a constitutional right, if established, would qualify as irreparable harm. *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) (finding that infringement on a First Amendment right, even for "minimal periods of time, unquestionably constitutes irreparable injury"). However, the likelihood of irreparable harm on this basis is dependent on the likelihood of success on the merits of the claim. *See Miranda v.*

29

*Garland*, 34 F.4th 338, 365 (4th Cir. 2022). Where the Court has not found such a likelihood, it does not presently find a likelihood of irreparable harm based on a constitutional violation. Plaintiffs have not otherwise shown a likelihood of irreparable harm because, as they acknowledge, they continue to engage in their same hiring practices and have not been subjected to any enforcement actions or other adverse consequences.

As for the other two factors, the Court finds that the balance of the equities and the public interest weigh against a preliminary injunction. When one party is the Government, these two factors merge and are properly considered together. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Although the Fourth Circuit has held that "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional," *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021), Plaintiffs have not established a likelihood of the merits of their claim.

Here, Defendants have identified a public interest weighing against the issuance of a preliminary injunction: that it would impair their "strong interest in ensuring equal employment opportunity for all, including freedom from discrimination on the basis of religion, sexual orientation, and gender identity" by restraining them from enforcing non-discrimination laws and "inviting other employers to invoke religious beliefs as an unwarranted shield from those laws." Defs.' Opp'n & Mot. Dismiss at 35, ECF No. 27-1 (citing *Rayburn*, 772 F.2d at 1168). In contrast, where Plaintiffs have been operating under their same hiring practices for nearly two years since the Maryland Supreme Court decided *Doe* and have faced no enforcement consequences, Plaintiffs have not been subjected to adverse consequences or a chilling effect that could move the balance of the equities in their favor. Thus, these factors presently weigh in favor of declining to issue a

30

preliminary injunction and not prematurely enjoining the MFEPA interpretation before a final determination on constitutionality is made.

Where all four factors weigh against the issuance of a preliminary injunction at this time, the Motion for a Preliminary Injunction will be denied.

## II.    Motion to Dismiss

Defendants seek dismissal of all counts for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), including the three counts that were the subject of the Motion for a Preliminary Injunction, consisting of Counts 1–3, and the remaining counts, consisting of Counts 4–7.

### A.    Legal Standard

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

### B.    Counts 1–3

The standard for a plaintiff to prevail on a motion to dismiss is lower than the standard for obtaining a preliminary injunction. *See EndoSurg Med., Inc. v. EndoMaster Med., Inc.*, 71 F. Supp. 3d 525, 539 (D. Md. 2014). However, the Court's findings that Plaintiffs are not likely to succeed on the merits of these claims are based primarily on legal analysis. As to Count 1, even

31

accepting Plaintiffs' assertion that having all of their employees be members of the Seventh-day Adventist Church is "a critical component" of their religious exercise and the facts alleged in the Complaint in support of that position, Compl. ¶ 3, the Court does not presently find that Plaintiffs will prevail on its claim based on the church autonomy principle because they are effectively seeking an expansion of the ministerial exception to apply to all employees, a step which the Court finds to be inconsistent with existing Fourth Circuit precedent. *See supra* part I.B.1. As to Count 3, the Court similarly finds, based on the legal analysis above, that even accepting the facts asserted in the Complaint, Plaintiffs' claim will not prevail because as a legal matter, the MFEPA is neutral and generally applicable, such that rational basis review applies, and that standard is readily satisfied here. *See supra* part I.B.3.

Nevertheless, the Court recognizes that Plaintiffs are in good faith seeking an extension of the law in Count 1, and that on Count 3, Plaintiffs have a different interpretation of the law on the issue of the applicable level of scrutiny that is not strictly foreclosed by precedent. Ordinarily, a court should refrain from dismissing outright a claim asserting a novel legal theory that can be better assessed after factual development. *See Wright v. North Carolina*, 787 F.3d 256, 263 (4th Cir. 2015). Thus, where it is at least arguable that further factual development through discovery is warranted before final resolution of these claims, the Motion to Dismiss will be denied as to Counts 1 and 3.

As for Count 2, although the Court's finding that Plaintiffs are not likely to succeed on the merits is similarly based on legal rather than factual deficiencies, the Court reaches a different conclusion. As discussed above, Plaintiffs' government entanglement theory rests primarily on the application of the now defunct *Lemon* test, and to the extent that it is arguably viewed as a novel legal theory separate from *Lemon*, Plaintiffs have identified no basis to conclude that

32

government entanglement alone could warrant a finding that the MFEPA violates the Establishment Clause under presently applicable standards. Moreover, as discussed at the hearing on this Motion, this argument effectively overlaps with the church autonomy argument asserted in Count 1, so there is no need to pursue this separate claim. The Court will therefore dismiss Count 2.

### C.    Count 4: Denominational Discrimination

Defendants seek dismissal of Plaintiffs' claim in Count 4 that the Maryland Supreme Court's interpretation of the MFEPA religious exemption constitutes denominational discrimination in violation of the Establishment Clause because it treats religious institutions whose beliefs require its employees to share their faith at work unfavorably as compared to those that do not have such a belief, and because it favors religious institutions with fewer than 15 members by providing them with a separate exemption.

The Establishment Clause bars government action that "officially prefer[s]" one religious denomination over another. *Larson v. Valente*, 456 U.S. 228, 244 (1982). Accordingly, laws that draw "explicit and deliberate distinctions between different religious organizations" are subject to strict scrutiny. *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 101 (4th Cir. 2013) (quoting *Larson*, 456 U.S. at 246). However, statutes that do not make such distinctions but may result in "a disparate impact on different denominations" are subject to less exacting review, which had historically been "the less rigorous test set forth in *Lemon.*" *Id.* In *Larson*, the Supreme Court found that a Minnesota state statute that imposed on religious organizations registration and reporting requirements relating to their solicitation of charitable contributions, but exempted from those requirements those organizations that receive more than 50 percent of their contributions from members, was unconstitutional based on denominational discrimination because "the provision

effectively distinguishes between well-established churches that have achieved strong but not total financial support from their members . . . and churches which are new and lacking in a constituency" or "favor public solicitation over general reliance on financial support from members." *Id.* at 230, 246–47 & n.23. In the recent case of *Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission*, 605 U.S. ___, No. 24-154, 2025 WL 1583299 (June 5, 2025), the Supreme Court applied *Larson* to find unconstitutional based on denominational discrimination a Wisconsin statute providing nonprofit organizations an exemption from payment of unemployment compensation taxes if they are "operated, supervised, controlled, or principally supported by a church" and "operated primarily for religious purposes." *Id.* at 2. Where the state had concluded that Catholic Charities Bureau did not meet the latter requirement because it did not engage in proselytization or limit its services only to fellow Catholics, the Court held that such an exemption, the eligibility for which "turns on inherently religious choices," effected denominational discrimination because it disfavored certain religions, such as Catholicism, that forbid using charity for purposes of proselytization and mandate that charitable services be provided without regard to religion. *Id.* at *7, *9.

Here, unlike the statute in *Larson*, which explicitly distinguished religious institutions based on their funding structure, the MFEPA religious exemption, as interpreted by the Maryland Supreme Court, draws no "explicit and deliberate" distinctions among religious organizations, whether based on their identity, beliefs, or any particular factor. *Liberty Univ.*, 733 F.3d at 101. The references in the MFEPA to exempting religious institutions "with respect to the employment of individuals of a particular religion . . . to perform work connected to the activities of the religious entity," Md. Code Ann., State Gov't § 20–604(2), and in *Doe* to limiting this term to employees whose duties "directly further the core mission (or missions) of the religious entity," *Doe*, 300

34

A.3d at 132, draw no distinction based on any aspect of the religious institution's activities or mission. Significantly, unlike in *Catholic Charities Bureau*, the MFEPA religious exemption does not draw distinctions based on "inherently religious choices," 2025 WL 1583299, at \*7, because it can apply regardless of whether the entity's mission is religious or secular. *Doe*, 300 A.3d at 136. The exemption's applicability instead turns on whether the employee's work is "one or more steps removed" from furthering the entity's mission, essentially, the employee's proximity to the entity's core activities and whether the employee works in a support function, such as that of a janitor. *See id.* Likewise, the alleged favorable treatment of religious institutions with fewer than 15 employees arises from the generally applicable exemption for all employers of that size and thus draws no distinction among religious employers based on size akin to the explicit distinctions drawn in *Larson.*

Rather, the MFEPA religious exemption at most causes a disparate impact on Plaintiffs akin to the provision at issue in *Hernandez v. Commissioner of Internal Revenue*, 490 U.S. 680 (1989), which was challenged under the Establishment Clause based on alleged denominational discrimination. *Id.* at 695. In *Hernandez*, the Court considered a provision of the Internal Revenue Code which permits taxpayers to deduct the amount of a charitable contribution to religious institutions but which was applied so as to disallow deductions for payments made to the Church of Scientology for auditing and training sessions attended by the payors because the payors received benefits in exchange for the payments, such that they could not be deemed to be gifts. *Id.* at 683, 686–87. The Court found that the provision differentiating between "deductible and nondeductible payments to statutorily qualified organizations," even while resulting in a specific disparate impact on the Church of Scientology because of its practices relating to auditing and training sessions, did not facially differentiate among sects and thus did not implicate

35

denominational discrimination under *Larson*. *Id.* at 695. The Court further found that, upon consideration of the then-applicable *Lemon* test, the provision did not otherwise violate the Establishment Clause. *Id.* at 696.

Likewise, where the MFEPA religious exemption does not differentiate among religious organizations and at most results in a disparate impact, strict scrutiny does not apply. *See id.* Under *Liberty University,* the next step would be to apply the now defunct *Lemon* test. *Liberty Univ.*, 733 F.3d at 101. Plaintiffs, however, have not alleged in Count 4, and have not argued in their briefs, that the facts demonstrate that the MFEPA religious exemption does not comply with the *Lemon* test or the successor analysis for an Establishment Clause claim. Accordingly, the Court finds that they have failed to state an Establishment Clause claim for denominational discrimination under *Larson* and will dismiss Count 4.

### D.    Count 5: Expressive Association

Defendants also seek dismissal of Count 5, in which Plaintiffs allege that the MFEPA violates their right to expressive association under the First Amendment by forcing them to "accept members it does not desire." Compl. ¶ 125 (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984)). Plaintiffs assert that because their sincerely held religious beliefs require their employees "to be models in every facet of their lives," Gen. Conference Employee Handbook at 29, the MFEPA infringes on their right to expressive association by forcing them "to hire or retain employees whose words or conduct undermine Plaintiffs' expression of [this] religious belief." Compl. ¶ 129.

The First Amendment protects the freedom to associate—or not associate—"for the purpose of . . . engaging in speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618, 623 (1984). This right is implicated

36

when a group seeks to engage in activities protected by the First Amendment, including those related to "political, social, economic, educational, religious, and cultural ends." *Id.* at 622. As the Court stated in *Roberts*:

> An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed. According protection to collective effort on behalf of shared goals is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority.

*Id.* at 622 (internal citation omitted). Laws that infringe on the right to associate, including by interfering with the internal organization of the group, are constitutional only if they serve "compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.* at 623.

The right to expressive association has most typically been applied, including in the case law cited by Plaintiffs, to protect the rights of voluntary membership organizations to choose their members rather than the rights of employers to choose their employees. For example, in *Roberts*, the Supreme Court found that expressive association rights were implicated by a state law that compelled local chapters of a private national membership organization to accept women as members. *Id.* at 612. In *Kidwell v. Transportation Communications International Union*, 946 F.2d 283, 301 (4th Cir. 1991), the Fourth Circuit considered whether the right to expressive association protected a union's right to choose its members based on their willingness to pay full dues. *Id.* at 301–02. In *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) ("*Boy Scouts*"), the Court held that the right of expressive association protected the right of the Boy Scouts, a nonprofit, membership-based organization, to revoke the membership and position as an assistant scoutmaster of an individual because he was homosexual and advocated for gay rights, because

37

his membership and role undermined its ability to advocate its viewpoints on homosexuality. *Id.* at 644, 656.

Neither the Supreme Court nor the Fourth Circuit, however, has found that employers have expressive association rights or that the act of hiring is considered to be expressive activity. Although at the hearing on the Motions, Plaintiffs cited *NAACP v. Button*, 371 U.S. 415 (1963), and asserted that it found that "hiring attorneys was expressive association because the organization was devoted to a certain cause and needed employees who would further the work of that organization," Hrg. Tr. at 29, the Court in *NAACP*, in considering the constitutionality of a state statute that prevented certain groups from soliciting litigation business for an attorney, held only that the plaintiff organizations' activities of financing and advancing litigation and identifying attorneys to pursue the litigation are "modes of expression and association protected by" the First Amendment, not that its hiring of particular personnel to conduct those activities was so protected. 371 U.S. at 419, 428–31. The Supreme Court has since rejected an argument that the decision whether to promote an associate to partner at a law firm was protected by the First Amendment right of freedom of association and stated that "[i]nvidious private discrimination . . . characterized as a form of exercising freedom of association . . . has never been accorded affirmative constitutional protections." *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (quoting *Norwood v. Harrison*, 413 U.S. 455, 470 (1973)). Other courts have rejected application of the right of expressive association to a discriminatory hiring decision. *See, e.g., Starkey v. Roman Cath. Archdiocese of Ind., Inc.*, 496 F. Supp. 3d 1195, 1209 (S.D. Ind. 2020) (citing *Hishon*); *McMahon*, 704 F. Supp. 3d at 1143–45 (distinguishing *Boy Scouts* as not relating to an employment decision and finding that even if the right of expressive association applies in the employment context, it did not justify the decision not to hire based on the relevant facts).

38

Plaintiffs have identified limited authority in which hiring decisions were treated as protected by the right of expressive association. In *Slattery v. Hochul*, 61 F.4th 278, 287–88 (2d Cir. 2023), the United States Court of Appeals for the Second Circuit held that a nonprofit organization opposed to abortion and that had a policy of declining to hire or retain employees who obtained abortions or engaged in extramarital sexual relations had stated a plausible claim that a New York law prohibiting it from taking adverse employment actions based on "reproductive health decisions" unconstitutionally burdened the nonprofit's right to expressive association. *Id.* at 283–84; *see also Our Lady's Inn v. City of St. Louis*, 349 F. Supp. 3d 805, 809, 812, 821–22 (E.D. Mo. 2018) (holding that a city ordinance that prohibits employment discrimination based on a person's reproductive health decisions or pregnancy burdened the expressive association rights of an organization whose mission is to discourage homeless women from having abortions); *Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571, 614–16 (N.D. Tex. 2021).

Since *Slattery*, however, the Second Circuit has recognized that "[t]he Supreme Court has never explicitly addressed whether, and to what extent, an *employer* has a right of expressive association with respect to its paid employees" and has explicitly recognized that there are "significant differences between voluntary associations and employment relationships," including that employees "rely on their jobs for their livelihoods" and "significant power imbalances often exist" in employment relationships "which may not be present in voluntary associations." *CompassCare v. Hochul*, 125 F.4th 49, 58–60 (2d Cir. 2025). The court therefore held that to the extent that the right of expressive association applies in the employment context, "the long and complex history of regulation of employment relationships" warrants that a different standard apply to employment-related claims under which the right is violated only when the governmental

action "threatens" the "very mission" of the employer "not only in a vague and generalized sense, but in the context of a specific employment decision" in that it "will impede the organization's ability to engage in . . . protected activities or to disseminate its preferred views." *Id.* at 60–61. To assess whether such a standard has been met, courts must consider two factors: (1) "the responsibilities of the position at issue, including whether it is client-facing and whether it involves expressly or implicitly speaking for the organization"; and (2) "the particular conduct or attribute of the employee that renders the employment of that person, in that position, a threat to the employer's mission." *Id.* at 61.

Where neither the Supreme Court nor the Fourth Circuit has held that the right to expressive association can justify a discriminatory employment decision, the Court will not find that the right applies to Plaintiffs' employment decisions. To the extent that such a right can be established, the Court finds that the allegations presently do not support a plausible claim for relief. Where Plaintiffs seek not a decision as to an individual hiring decision, but a blanket rule that it may discriminate based on religious belief as to every position, they have not provided a basis to conclude that the hiring of a non-member for every position would infringe on the right under either the *Boy Scouts* or *CompassCare* standards, which require consideration of how a group's ability to express particular viewpoints may be affected by the inclusion of certain individuals. Specifically, in *Boy Scouts*, the Court reasoned that the "forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." 530 U.S. at 648. Meanwhile, in *CompassCare*, the Second Circuit directed courts to consider the responsibilities of the employment position in question, whether it involves speaking for the organization, and the particular conduct or attribute of the prospective employee and how it

40

impedes the organization's ability to engage in protected activities or to disseminate its preferred views. *See* 125 F.4th at 61.

Here, Plaintiffs have not provided allegations demonstrating that each of their employee positions is engaged in expression on behalf of the organization or that the presence of non-members in certain positions would undermine the ability of the organization to advocate public or private viewpoints. Indeed, the standard set by the Maryland Supreme Court in *Doe*—that is, the guidance that courts should determine whether an employee's work directly furthers a core religious or secular mission of the religious entity—is meant to allow for the exclusive hiring of members of the faith for some positions, which likely includes those necessary to avoid any arguable infringement on the right of expressive association. Accordingly, the Court finds that under its view of the legal landscape, Plaintiffs have not stated a viable claim of a violation of the right to expressive association. Nevertheless, as with Counts 1 and 3, where Plaintiffs are seeking an extension of the law to have claims based on expressive association apply to the employment context, and further factual development is arguably warranted before full disposition of this claim, the Motion to Dismiss will be denied as to this claim. *See Wright*, 787 F.3d at 263.

### E.    Count 6: Right of Assembly

Defendants also seek dismissal of Count 6, in which Plaintiffs allege that the MFEPA violates their First Amendment right of assembly by infringing on their ability to carry out their ministry with a mission-aligned staff. Plaintiffs have cited no authority in support of the proposition that the right to assembly protects employers in their hiring practices. The only case cited, *United Mine Workers of America, District 12 v. Illinois State Bar Ass'n*, 389 U.S. 217 (1967), relates to the entirely different context of whether a labor union has a First Amendment right to hire an attorney to represent its members in pursuing worker's compensation and other

workplace-related claims. *Id.* at 218, 222. The Fourth Circuit has read this case to implicate the right to "collective activity undertaken to obtain meaningful access to the courts," a right that is not applicable here. *Cap. Associated Indus., Inc. v. Stein*, 922 F.3d 198, 205 (4th Cir. 2019) (quoting *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 585–86 (1971)). Accordingly, the Court finds that Plaintiffs have failed to state a plausible claim based on the First Amendment right to assembly and will dismiss Count 6.

### F.    Count 7: Unconstitutional Vagueness

Finally, Defendants seek dismissal of Count 7, in which Plaintiffs allege that the MFEPA as interpreted by *Doe* is unconstitutionally vague because Plaintiffs do not have fair notice of which positions will be subject to the statute's non-discrimination requirements and which will be deemed to be subject to the religious exemption because they "directly further[]" the Seventh-day Adventist Church's mission. Prelim. Inj. Reply & Opp'n Mot. Dismiss at 20. A statute is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Cap. Associated Indus.*, 922 F.3d at 210 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). Under this standard, "perfect clarity and precise guidance have never been required." *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). Indeed, for civil statutes, even less clarity is required than for criminal provisions. *Manning v. Caldwell*, 930 F.3d 264, 272 (4th Cir. 2019).

In *Doe*, the Maryland Supreme Court defined the term "employment of individuals . . . to perform work connected with the activities of the religious entity," Md. Code Ann., State Gov't § 20–604(2), as the employment of personnel "who perform duties that directly further the core mission (or missions) of the religious entity." *Doe*, 300 A.3d at 132. The court did not stop there

42

but instead provided that this determination would be a multi-factored analysis requiring a consideration of the "totality of the pertinent circumstances" and provided five factors to consider in making that determination. *Id.* at 136–37; *see supra* Background part II. Although the court did not provide a bright-line rule, this multi-factor guidance is similar in kind to the totality-of-the-circumstances analysis that the United States Supreme Court has established for determining whether the ministerial exception applies. *See Our Lady of Guadalupe School*, 140 S. Ct. at 2063–64 (citing *Hosanna-Tabor*, 132 S. Ct. at 694). In *Our Lady of Guadalupe School*, the Court specifically rejected the argument that the lack of a "rigid formula" rendered the test "not workable." *Id.* at 2069. Because the statute and the Maryland Supreme Court's interpretation provide sufficient notice of what is prohibited, the Maryland statue is not unconstitutionally vague on its face or as applied to Plaintiffs. The Court will therefore dismiss Count 7.

## CONCLUSION

For the foregoing reasons, the Motion for Preliminary Injunction, ECF No. 15, will be DENIED. The Motion to Dismiss, ECF No. 27, will be GRANTED IN PART and DENIED IN PART. The Motion will be granted as to Counts 2, 4, 6, and 7, which will be dismissed, and will be denied as to Counts 1, 3, and 5, which shall proceed. A separate Order shall issue.

Date:    June 18, 2025

THEODORE D. CHUANG
United States District Judge